38 P.3d 1192

**STATE of Arizona, Appellee,**

v.

**Carl Lee BLACKMAN, Appellant.**

**No. 1 CA–CR 99–0719.**

Court of Appeals of Arizona, Division 1, Department A.

Jan. 17, 2002.

Janet A. Napolitano, Arizona Attorney General, by Randall M. Howe, Chief Counsel, Criminal Appeals Section and Ginger Jarvis, Assistant Attorney General, Phoenix, Attorneys for Appellee.

James J. Haas, Maricopa County Public Defender, by G.W. Simpson, Deputy Public Defender, Phoenix, Attorneys for Appellant.

## OPINION

BERCH, Judge.

¶ 1 Carl Lee Blackman ("Defendant") appeals his convictions and sentences for kidnapping and two counts of sexual assault, all class two felonies. For the following reasons, we affirm.

## BACKGROUND

¶ 2 The charges against Defendant arose from an incident in which fifteen-year-old T.S., who suffered from mild to moderate retardation, was forced to engage in sex over

the course of several hours with Defendant and several other teenage boys.[1]

¶ 3 Between 5:00 and 6:00 p.m. on February 15, 1997, as T.S., the victim, was walking with S.B., an eleven-year-old girlfriend, T.S. saw Darrion Hartley and Defendant Blackman, whom she knew, with some of their friends. One of the friends grabbed T.S. and pushed her toward Defendant. Defendant grabbed T.S.'s shirt and pulled her toward Hartley, who put his arm around her waist. Defendant gave S.B. a dollar and told her to leave and not tell.

¶ 4 Although T.S. said she did not want to go, Defendant and several other boys took T.S. to an abandoned house. Hartley told her no one was in the dark house and took her inside. Once T.S. was inside, someone flicked a lighter and T.S. saw several boys, perhaps as many as thirty.

¶ 5 Despite her protests, T.S. was forced to engage in vaginal and oral sex with an unknown number of boys. Later in the evening, after several hours of abuse, some of the boys took T.S. to Hartley's house, later returning her to the abandoned house where she was again sexually assaulted. T.S. remained in the abandoned house until approximately 1:00 p.m. the next day. When the boys left, T.S. fled to her aunt's house and called her mother. T.S.'s mother arrived to find T.S. crying and shaking. Her hair was unkempt, her clothes were wrinkled and bloody, and she had blood on her legs.

¶ 6 Defendant was charged with one count of kidnapping and two counts of sexual assault. The State also alleged that the kidnapping and sexual assaults were committed with the intent to promote or assist a criminal street gang. See Ariz.Rev.Stat. ("A.R.S.") § 13–604(T) (2001).

¶ 7 Defendant was tried jointly with four others, all of whom faced similar charges. At trial, T.S. testified that Defendant forced her to engage in several sex acts. The State presented evidence that DNA analysis of stains on the victim's clothing and semen found in condoms at the abandoned house linked each defendant to the crime scene.

Additionally, a Phoenix police detective testified that, when interviewed, Defendant stated that he was present when T.S. and S.B. were first contacted on the street and that he gave S.B. a dollar to leave. According to the detective, Defendant admitted that he had sex with T.S., but he said that she had consented.

¶ 8 The defendants contended that all sexual activity between them and T.S. had been consensual, and T.S. acknowledged that she had previously engaged in consensual sex with Defendant and three of the four other defendants.

¶ 9 Defendants also alleged that T.S. lied about being raped because she feared retribution from her mother for staying out all night and having sex. Evidence was also presented that T.S. had problems with lying, running away, and being untrustworthy. In addition, evidence was presented that T.S. had previously accused another of rape, then recanted.

¶ 10 Defendant was convicted of kidnapping and two counts of sexual assault and acquitted of all charges that the activity was intended to further or assist a street gang. The court sentenced him to concurrent, aggravated terms of nine years on each sexual assault count and to a consecutive seven-year term of probation on the kidnapping count. Defendant timely appealed. We have jurisdiction pursuant to article 6, section 9 of the Arizona Constitution and A.R.S. §§ 12–120.21(A)(1) (1992), 13–4031 (2001), and 13–4033(A) (2001).

## ISSUES

¶ 11 Defendant argues on appeal that we must reverse his convictions because (1) the trial court abused its discretion by striking for cause a qualified prospective juror and failing to strike an unqualified prospective juror, (2) the trial court erred by not severing Defendant's trial from those of his codefendants and by denying a motion for mistrial after a co-defendant's statement was admitted into evidence, and (3) the prosecu-

---

1. On review, we view the facts in the light most favorable to sustaining the verdict. State v.

*Greene*, 192 Ariz. 431, 436, ¶ 12, 967 P.2d 106, 111 (1998).

tor engaged in misconduct during closing argument.

## DISCUSSION

### A. Jury Selection

▮ ¶ 12 This case poses some difficult issues relating to challenges to members of the panel of prospective jurors. Because of the profound importance of these issues, we indulge in a somewhat lengthy reminder of the standards that govern our inquiry. A trial court must dismiss a prospective juror for cause only when "there is reasonable ground to believe that a juror cannot render a fair and impartial verdict." Ariz. R.Crim. P. 18.4(b). This may be shown by demonstrated bias or prejudice that renders the juror unable to listen to and evaluate the evidence presented. Although the court should remove for cause any juror who expresses serious misgivings about the ability to be fair and impartial, *State v. Smith*, 182 Ariz. 113, 115, 893 P.2d 764, 766 (App.1995), it need not remove jurors who ultimately assure the trial court that they can be fair and impartial. *State v. Reasoner*, 154 Ariz. 377, 384, 742 P.2d 1363, 1370 (App.1987). But, as LaFave and Israel relate in their treatise on criminal procedure, a juror need not be excused "merely because he knows something of the case to be tried or has formed some opinions regarding it." Wayne R. LaFave and Jerold H. Israel, 2 CRIMINAL PROCEDURE § 21.3, at 729 (1984). Indeed, they note that the fact that a juror has formed "an opinion or impression regarding the guilt or innocence of the defendant shall not of itself be sufficient ground of challenge to a juror, if he declares, and the court is satisfied, that he can render an impartial verdict according to the evidence." *Id.* (quoting ALI Code of Criminal Procedure § 277(j) (1930)). This standard "emphasiz[es] the consequent importance of the peremptory challenge in the jury selection process." *Id.* at 732.

▮ ¶ 13 Because the trial court has the opportunity to observe prospective jurors first hand, the trial judge is in a better position than are appellate judges to assess whether prospective jurors should be allowed to sit. *See State v. Lavers*, 168 Ariz. 376, 390, 814 P.2d 333, 347 (1991). We therefore will not disturb a trial court's decision on a motion to strike a juror for cause unless we find a clear abuse of discretion. *State v. Medina*, 193 Ariz. 504, 511, ¶ 18, 975 P.2d 94, 101 (1999); *State v. Hill*, 174 Ariz. 313, 319, 848 P.2d 1375, 1381 (1993). Defendant bears the burden of demonstrating that the prospective juror "could not reasonably render a fair or impartial verdict." *State v. Dickens*, 187 Ariz. 1, 11, 926 P.2d 468, 478 (1996).

▮ ¶ 14 The erroneous denial of a defendant's motion to excuse a juror for cause infringes the defendant's substantial right to a full complement of peremptory challenges because the defendant must then use a peremptory strike to remove the biased juror. *See State v. Huerta*, 175 Ariz. 262, 855 P.2d 776 (1993); *State v. Ibanez*, 201 Ariz. 56, 59, ¶ 13, 31 P.3d 830, 833 (App.2001). In such a case, the conviction must be reversed, even if the defendant cannot show that he has suffered any prejudice. *Huerta*, 175 Ariz. at 263, 855 P.2d at 777.

¶ 15 The record in this case reveals that many prospective jurors were removed for cause. No party, however, has alleged that the trial court exhibited partiality in ruling on the motions to strike for cause, and we see no evidence of bias.

¶ 16 Against this background, we address the jury-selection issues presented by Defendant.

### 1. Juror L.G.

¶ 17 On the third day of jury selection, Juror L.G. asked to speak to the court privately. He told the court that, because he was aware of conditions in prison, he would find it "very hard to be objective" in the case and "very difficult to not be prejudiced." Moreover, he would be "looking for ways to keep [defendants] out of prison." When asked if he would be able to be fair and impartial and decide the case only on the law and the evidence, L.G. responded: "I thought I would be able to do that. But I've been wrestling with this all night, and I think it would be very difficult not to be prejudice[d] in favor of the defendants."

¶ 18 The court relayed this information to counsel, describing L.G. as "somewhat emotional." After the juror's remarks were read by the court reporter, the State moved to strike L.G. for cause. Counsel for Co-defendant Auzenne objected.[2] The court then permitted defense counsel to question the juror.

¶ 19 When asked whether he would follow the law, L.G. stated "I would be prejudiced in my decisions to follow the law, but I would follow the law." While the prospective juror stated that he would find the defendants guilty if the State proved its case beyond a reasonable doubt, he added that he "would be looking for reasons to find them not guilty and [would] not be as objective as I would like to be." The juror told the court that, because of his attitude and mindset, he thought he would have problems deciding the case based on the evidence presented, but would try his best. He also indicated that if testimony conflicted, he would resolve the conflict in favor of the defendants. The juror responded affirmatively when asked if he wanted to be excused from service.

¶ 20 The trial court excused the juror for cause.

¶ 21 On appeal, Defendant argues that L.G.'s statements were merely a layperson's expression of the presumption of innocence. Defendant contends that, because L.G. stated he would convict if the State proved its case beyond a reasonable doubt, he was fit to be seated as a juror and the trial court erred in excusing him.

¶ 22 The question before this court is whether the trial court abused its discretion in concluding that reasonable grounds existed to believe that L.G. could not render a fair and impartial verdict. Ariz. R.Crim. P. 18.4(b).

■■ ¶ 23 Although a juror's promise to render a verdict based on the law and evidence need not be stated in absolute terms, *State v. Trostle,* 191 Ariz. 4, 13, 951 P.2d 869, 878 (1997), in this case, the juror's statements that he would try to follow the law are intertwined with comments that cast doubt on the wavering assurances he did give. In stating that he would follow the law, L.G. added that he would be prejudiced in defendants' favor in doing so and would not be objective. In confirming that he would try to base his decision on the evidence, he expressed concern that he would have a problem doing so. Furthermore, his statement that he would give the benefit to the defendants where testimony conflicted and would be "looking for reasons to find [defendants] not guilty" suggests that, rather than basing his decision on a fair evaluation of the quality of the evidence and credibility of the witnesses, he would tend to simply accept as true the testimony favorable to the defendants. His answers demonstrated his serious misgivings and raised substantial doubt about his ability to be fair and impartial. *See Smith,* 182 Ariz. at 115, 893 P.2d at 766. On this record, we cannot conclude that the trial court clearly abused its discretion in determining that there were reasonable grounds for believing that L.G. could not render a fair and impartial verdict.[3]

¶ 24 Defendant claims that by striking L.G. the trial court committed error that requires reversal pursuant to *Huerta,* 175 Ariz. at 262, 855 P.2d at 776. The Arizona Supreme

2. The trial court had ruled that objections made by any defendant applied to all defendants unless a defendant expressly stated a contrary desire. Thus, Co-defendant Auzenne's objection preserved any error for Defendant.

3. Defendant contends that L.G.'s circumstances were similar to those of Juror G.N., a prospective juror the court refused to strike for cause the day before. The situations, however, differ. Responding to whether he or a relative had ever been the victim of a crime, G.N. stated that his wife of twenty months, who had committed suicide eleven years earlier, had been molested at age twelve and gang raped when she was in her twenties, years before G.N. met her in the 1980s.

Regarding the rapes, G.N. did not know the assailants' race, whether any arrests had been made, or any other details. G.N. stated that he believed that his wife's suicide resulted from her molestation-related depression. When asked if his experience would make it difficult to be fair and impartial, he responded, "I don't think so." When asked if he thought he could decide the case based on the evidence in the trial, he responded, "Yes, sir." Although he did indicate that hearing this type of case might be difficult for him, G.N., unlike L.G., did not express misgivings about his ability to be fair and impartial and to base his decision on the evidence presented.

Court has previously considered and rejected a similar claim, concluding that *Huerta* is implicated only if a trial court erroneously fails to strike a prospective juror for cause, not in those cases in which a prospective juror is excused for cause. *See State v. Walden,* 183 Ariz. 595, 609, 905 P.2d 974, 988 (1995), *disapproved on other grounds, State v. Ives,* 187 Ariz. 102, 107, 927 P.2d 762, 767 (1996). We are bound by that decision. *See Myers v. Reeb,* 190 Ariz. 341, 342, 947 P.2d 915, 916 (App.1997). Moreover, we have concluded that the trial court did not abuse its discretion in excusing L.G. for cause.

### 2. *Juror R.C.*

¶ 25 The failure to exclude potential juror R.C. for cause presents a more troublesome issue. During voir dire, Defendant's counsel asked whether anyone believed that a mildly to moderately retarded person was incapable of consenting to sex acts. Juror R.C. raised his hand. In private, R.C. told the court and counsel:

> I believe sex is an important decision, because it can be, it can have serious consequences and potentially fatal consequences, and I don't believe that a mentally impaired person could necessarily make the distinction and foresee the events that might come to pass after that.
>
> . . . .
>
> And you can't consent to something that you can't fully conceive.

R.C. acknowledged that there are degrees of mental impairment.

¶ 26 Defendant's counsel moved to strike the juror for cause, arguing that R.C. had already decided the ultimate issue in the case—whether T.S. had been raped or whether the acts had been consensual—by concluding that she was not capable of consenting to sex acts. The trial judge denied the motion.

¶ 27 Having no evidence before him, R.C. necessarily relied upon assumptions as to what the evidence might show. In this case, however, such matters as whether the State intended to present evidence of T.S.'s mental ability and whether such evidence would be admitted—or would be persuasive—remained undetermined and certainly unproved. Thus, whether the State could or would try to prove that T.S. suffered any mental impairment that might affect her ability to consent to the acts in this case was unknown. T.S.'s level of impairment, if any were proved, might have differed from the level of impairment at which R.C. thought a person's ability to consent would be compromised. Moreover, R.C.'s comments were not conclusive. R.C. stated that he did not believe that a mentally impaired person could *"necessarily"* appreciate the consequences of sex and therefore give valid consent to it. This equivocal statement, coupled with the acknowledgment that degrees of impairment exist and R.C.'s agreement to follow the court's instructions, did not require that R.C. be stricken for cause.

¶ 28 Nor had the judge defined the legal concept of consent. It may have been that whether T.S. intended to consent or had the ability to consent was less important than the Defendant's perception that she consented. All of these questions affect the determination whether a juror has necessarily prejudged a case.

¶ 29 The court did attempt to ascertain whether R.C. could be fair and impartial, but R.C. misunderstood the thrust of the questions as relating to his ability to do his work before and after trial time.[4] Despite the court's invitation, none of the attorneys present took the opportunity to question R.C. further to ascertain whether he could serve as a fair and impartial juror. *See* Ariz.

---

4. [The Court]: If you're not excused, and you are chosen as one of the 16 jurors, of course, you won't be at work. Is that going to make it difficult or hard for you to be a fair and impartial juror?

 [R.C.]: I will be at work. I will go to work early. I'll put in three hours before I come here, if that's the case. Because I need to be at work.

 [The Court]: All right. And in your mind, do you still think you can do the work as an [e]ffective juror?

 [R.C.]: I think so. I think I could get reasonable sleep, which is what would be most important.

R.Crim. P. 18.5; *State v. Lopez*, 134 Ariz. 469, 471, 657 P.2d 882, 884 (App.1982). The burden rests on a party seeking to exclude a potential juror to elicit information demonstrating the juror's unsuitability. *State v. Medina*, 193 Ariz. 504, 511, ¶ 18, 975 P.2d 94, 101 (1999). It is not the trial judge's responsibility to conduct defense counsel's case by devising and asking follow-up questions designed to exclude a presumptively qualified juror. *See* Ariz. R.Crim. P. 18.5; *Lopez*, 134 Ariz. at 471, 657 P.2d at 884.

¶ 30 Defense counsel was in the best position to evaluate his case and to assess the evidence the State might present and was provided the opportunity to ask follow-up questions in an attempt to demonstrate either that R.C. had determined the ultimate issue or that he would not fairly and impartially consider the evidence or follow the law. Counsel failed to avail himself of the opportunity. The judge's ruling that counsel could use one of his peremptory challenges if he believed that the evidence would demonstrate that T.S. might lack the capacity to consent was not an abuse of discretion.

¶ 31 At the beginning of voir dire, the trial court inquired whether any prospective juror would have difficulty following the court's instructions or would have difficulty being fair or impartial. R.C. did not indicate that he would have difficulty doing either. R.C. therefore did not indicate that he was unable or unwilling to assess the evidence presented at trial fairly and impartially, *see, e.g., State v. Rodriguez*, 131 Ariz. 400, 402, 641 P.2d 888, 890 (App.1981), and did not demonstrate bias for or against either party or any witness, *see, e.g., State v. Eastlack*, 180 Ariz. 243, 255–56, 883 P.2d 999, 1011–12 (1994).

¶ 32 Although this is a close question, in light of the fact that R.C.'s responses fail to demonstrate that he had a closed mind, and recognizing that the trial court was in the best position to decide whether R.C. was able to fairly evaluate the evidence or was biased,

we cannot conclude that the trial court clearly abused its discretion by declining to strike R.C. for cause. *See Dickens*, 187 Ariz. at 11, 926 P.2d at 478; *Walden*, 183 Ariz. at 609, 905 P.2d at 988; Ariz. R.Crim. P. 18.4(b). We also find it difficult to find reversible error where two other prospective jurors, N.M. and C.F., responded similarly to R.C., yet defense counsel failed to ask them follow-up questions, failed to request their removal for cause, and C.F. was placed on the jury.[5]

¶ 33 Defendant also claims that the trial judge's abuse of discretion in failing to strike R.C. for cause requires automatic reversal pursuant to *Huerta*, 175 Ariz. at 262, 855 P.2d at 776. *See supra* ¶ 24 (discussing *Huerta*). Because we conclude that the trial court did not abuse its discretion in not excusing R.C. for cause, we need not address Defendant's contention that *Huerta* requires reversal.

### B. Severance and Mistrial Motions: Background

¶ 34 Defendant argues that the trial court erred in failing to sever his trial from that of Co-defendant Darrion Hartley and in denying a motion for mistrial based on statements attributed to Hartley that were admitted at trial through the testimony of the victim's mother, M.A.

¶ 35 At trial, M.A. testified that within days of the incident she received a telephone call from Darrion Hartley. The court overruled a defense objection. M.A. then testified to the following conversation with Darrion Hartley:

> I asked Darrion, ... how many guys was there? He said, oh, about 30. And I said, did my daughter willingly have sex with you guys? He said no. That's when I asked him, I said, Darrion, you're supposed to [have] been my daughter's friend[;] she trusted you. I said[,] why did

---

5. N.M. shared R.C.'s belief that mentally impaired persons could understand the intimate nature of a sex act but may not understand the consequences. C.F. stated that her twenty-year-old mentally retarded nephew could not make a responsible decision about marriage, and counsel failed to inquire whether she also believed that a mentally retarded person was incapable of giving meaningful consent to sex acts. Because N.M.'s and C.F.'s responses also did not demonstrate that they had conclusively decided the main issue in this case, we conclude that the trial court's failure to strike them for cause was not fundamental error.

you let this happen? He said, it got out of control[;] it got out of hand.

The court told defense counsel it would hear motions later and immediately instructed the jury as follows:

[T]he evidence that you just heard, this statement allegedly made by Mr. Hartley[,] is being admitted against Mr. Hartley only, and is not to be considered by you as evidence against any of the other defendants in this case.

¶ 36 All defendants except Hartley moved for a mistrial. During argument on the motion, the prosecutor expressed surprise at the witness's statement about the unwillingness of the victim, advising the court that M.A. had not previously mentioned this part of the conversation in her interviews. Nevertheless, the State argued that the court's curative instruction addressed any problem arising from the statement. The court denied the mistrial motion:

It's clearly a statement by a party defendant. Frankly, whether she says it wasn't consensual, or whether it got out of control, I mean it's all admissible against [Hartley]. I've given a limiting instruction. I'll give it at any point in time you request it and it's applicable.

I'm not going to mistry this case at this point on that.

First of all, he didn't identify anyone else, that is Hartley, allegedly in his statements to [M.A.].

¶ 37 Defendants vigorously cross-examined M.A., who admitted that she had made contemporaneous notes of this telephone conversation but that the notes did not reflect Hartley's statement that the sex had been non-consensual or that the incident had gotten out of control. Hartley did not testify, and the prosecutor did not refer to Hartley's statement in closing argument.

¶ 38 The court instructed the jury that "[e]ach defendant is entitled to have his guilt or innocence as to each of the charges determined for him from his own conduct and from the evidence which applies to him, as if he was being tried alone." No other instruction on the issue was requested or given. After conviction, Defendant moved for a new trial based on the court's failure to sever or grant a mistrial as a result of the admission of this testimony. The court denied the motion.

### 1. Motion to Sever

¶ 39 After M.A. testified to her conversation with Hartley, Defendant contended that because Hartley's statements incriminated him, the trial court had erred in denying his pretrial motion to sever his trial from Hartley's trial.[6] We review for abuse of discretion a trial court's decision not to sever the trials of co-defendants. *See State v. Murray*, 184 Ariz. 9, 25, 906 P.2d 542, 558 (1995). A defendant challenging the denial of a motion to sever must show that, in light of the evidence before the court at the time the motion was made, the trial court clearly abused its discretion in denying the severance. *Id.; State v. Van Winkle*, 186 Ariz. 336, 339, 922 P.2d 301, 304 (1996) (stating that "rub-off" from unfavorable impression of one defendant to another "warrants severance only when the defendant seeking severance establishes a compelling danger of prejudice against which the trial court can not protect").

---

**6.** Defendant has failed to direct this court to any pretrial motion in the record seeking severance on the specific ground that Hartley's statements would prejudice him. We have reviewed several motions to sever raising various grounds, but are unable to locate any motion to sever by Defendant—or in which he joined—that placed this issue before the court.

On October 30, 1997, the trial court denied the motion to sever filed by several co-defendants, noting generally that "any statements allegedly made by any defendant can be redacted and/or sanitized so that another defendant's witness-confrontation right is not violated at a joint trial." Defendant, however, expressly excluded himself from this severance motion. On March 16, 1998, counsel for Co-defendant Johnson expressed the intent to file a motion to sever based on M.A.'s interview, but the record includes no such motion. Because Defendant has not cited the relevant portion of the record, Defendant has arguably waived this argument. *See State v. Carver*, 160 Ariz. 167, 175, 771 P.2d 1382, 1390 (1989) (stating that failure to argue a claim constitutes waiver). However, because the voluminous record is not clear regarding the various motions, we set forth our analysis of the issue.

¶ 40 The record shows that at the time Defendant's motion to sever was made, no one knew that M.A. would testify as she did. That she had talked to Co-defendant Hartley first came to light in M.A.'s March 13, 1998 interview by defense counsel. In that interview, however, no statement was made that the sexual conduct was non-consensual. That statement surprised all parties at trial and therefore was not before the trial judge when he considered the motions to sever. Had the truly incriminating statements been before the trial court, the motion to sever might well have been granted. But based on the evidence before the trial judge when he ruled on the motions to sever, he did not abuse his discretion in denying them. *See Murray*, 184 Ariz. at 25, 906 P.2d at 558.

### 2. *Motion for Mistrial: The Bruton Issue*

¶ 41 Defendant argues that the trial court erred in denying the motion for a mistrial made after M.A. testified regarding the telephone conversation with Hartley. He contends that the admission of Hartley's statement through M.A.'s testimony violated his Sixth Amendment right to confront the witnesses against him and was improper under the rule enunciated in *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). We review a trial court's denial of a motion for mistrial for an abuse of discretion, bearing in mind that a mistrial is a "most dramatic" remedy that "should be granted only when it appears that that is the only remedy to ensure justice is done." *State v. Maximo*, 170 Ariz. 94, 98–99, 821 P.2d 1379, 1383–84 (App.1991). We review *de novo* Defendant's Sixth Amendment claim. *See State v. Adams*, 197 Ariz. 569, 572, ¶ 16, 5 P.3d 903, 906 (App.2000).

¶ 42 The United States Supreme Court held in *Bruton* that a defendant is deprived of his Sixth Amendment right to cross-examine witnesses when a non-testifying co-defendant's confession incriminating the defendant is admitted at their joint trial, even if the trial court properly instructs the jury to consider the confession as evidence only against the confessing co-defendant. 391 U.S. at 137, 88 S.Ct. 1620. Although the rule is stated broadly, later cases have dramatically limited the type of statement found to be so incriminating that its admission into evidence necessarily violates the Sixth Amendment. *See infra* ¶¶ 44–50 (discussing *Richardson v. Marsh*, 481 U.S. 200, 107 S.Ct. 1702, 95 L.Ed.2d 176 (1987), and *Gray v. Maryland*, 523 U.S. 185, 118 S.Ct. 1151, 140 L.Ed.2d 294 (1998)).

¶ 43 The basic rule comes from *Bruton*, 391 U.S. at 123, 88 S.Ct. 1620. In that case, a witness testified that Bruton's co-defendant, Evans, had confessed that he and Bruton had committed an armed robbery. *Id.* at 124, 88 S.Ct. 1620. The trial judge instructed the jury that Evans' confession was inadmissible against Bruton. *Id.* at 125, 88 S.Ct. 1620. The United States Supreme Court reversed Bruton's conviction, holding that, despite the limiting instruction, the introduction of Evans' confession violated Bruton's Sixth Amendment right to cross-examine witnesses. *Id.* at 126, 88 S.Ct. 1620. The Court concluded that while the jury is generally expected to follow instructions given by the court, "there are some contexts in which the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored." [7] *Id.* at 135, 88 S.Ct. 1620.

¶ 44 Nearly twenty years later, the Court reconsidered *Bruton*. In *Richardson*, 481 U.S. at 200, 107 S.Ct. 1702, the Court declined to extend the *Bruton* rule to circumstances in which a confession by a nontestifying co-defendant was redacted to omit any reference to the defendant, but other evidence admitted at trial linked the defendant to the confession. *Id.* at 211, 107 S.Ct. 1702.

7. Evans' confession had been found not to be admissible even against Evans himself. *Bruton*, 391 U.S. at 124 n. 1, 88 S.Ct. 1620. This "concededly unconstitutional confession," *id.* (citations omitted), thus clearly should not have been introduced as evidence against Bruton because it could not be used against him. Since the confession was admissible against neither defendant, it should not have been introduced at trial. Indeed, the Solicitor General confessed error on this point. 391 U.S. at 125, 88 S.Ct. 1620.

The Court limited *Bruton,* holding that it created only a "narrow exception" to the "almost invariable assumption of the law that jurors follow their instructions." *Id.* at 206–07, 107 S.Ct. 1702 (citing *Francis v. Franklin,* 471 U.S. 307, 325 n. 9, 105 S.Ct. 1965, 85 L.Ed.2d 344 (1985)).

¶ 45 In *Richardson,* the central issue was whether Defendant Marsh had known before events unfolded that the victims were to be robbed and perhaps killed. She claimed she had not known, but her co-defendant, Williams, had confessed that he and a third defendant had discussed the plan in front of Marsh while driving to the victims' house. Defendant Williams' confession was admitted against Marsh at their joint trial. 481 U.S. at 203, 107 S.Ct. 1702. Williams' statement was redacted to omit all references to Marsh and was linked to her only through other evidence admitted at trial, including her admission that she was present at the scene and participated in certain aspects of the crime. *Id.* at 203–04, 107 S.Ct. 1702. As in the case before us, the trial court admonished the jury to consider the confession only against Williams and not to use it against Marsh. *Id.* at 205, 107 S.Ct. 1702.

¶ 46 The Court recognized that the statement incriminated Marsh, *id.* at 208 n. 3, 107 S.Ct. 1702, yet it ruled that the admission of the testimony did not violate the *Bruton* rule because the confession did not name her and became incriminating only after she was linked to the crimes. The same is true in Blackman's case. Hartley's incriminating statement did not name Blackman. The statement became incriminating only after evidence was presented—and Defendant eventually conceded—that he was present and participated in the sex acts.[8]

¶ 47 The Court in *Richardson* distinguished *Bruton* by focusing on the fact that the co-defendant's confession in *Bruton* had expressly implicated Bruton, whereas the confession in *Richardson* was incriminating not on its face, but only when linked to other evidence introduced at trial. *Id.* at 208, 107

S.Ct. 1702. The Court found the distinction between direct or explicit implication and inferential incrimination significant. While noting the overwhelming probability that jurors would not be able to follow instructions to disregard a directly incriminating confession such as the one in *Bruton,* the Court concluded that jurors would more easily be able to follow instructions to disregard a confession that was only inferentially incriminating. *Id.* The Court recognized that the presumption that juries follow their instructions is "rooted less in the absolute certitude that the presumption is true than in the belief that it represents a reasonable[,] practical accommodation of the interests of the state and the defendant in the criminal justice process." *Id.* at 211, 107 S.Ct. 1702.

¶ 48 *Richardson* thus limited *Bruton's* application to confessions that directly implicate a co-defendant. The Court held that the Confrontation Clause of the United States Constitution is not violated by admitting a non-testifying co-defendant's confession, with a proper limiting instruction, if the confession is redacted to eliminate not only the defendant's name, but also any necessary reference to the defendant's existence. *Id.* Arizona has followed *Richardson's* rule that, if a co-defendant's not-obviously-redacted statement does not incriminate a defendant unless there is reference to other evidence, the court may presume that the jury will follow the limiting instructions to use the confession against only the confessing co-defendant. *See State v. Herrera,* 174 Ariz. 387, 395, 850 P.2d 100, 108 (1993).

¶ 49 Several years after deciding *Richardson,* the Court addressed the admissibility of a confession in which the defendant's name was replaced by a neutral term. In *Gray,* 523 U.S. at 185, 118 S.Ct. 1151, the co-defendant confessed that he, the defendant, and a third person had participated in an assault. *Id.* at 188, 118 S.Ct. 1151. At trial, the police detective who read the confession inserted the word "deleted" in place of the names of the defendant and the third party.

---

8. The dissent maintains that Hartley's statement was directly incriminating because Defendant admitted being present and participating in sex with T.S. and that this factor distinguishes this case from *Richardson.* Dissent, ¶ 86. Marsh, however, also admitted being present and participating in some aspects of the crimes. This distinction therefore vanishes.

*Id.* The trial court instructed the jury that the confession was evidence only against the confessing co-defendant. *Id.* at 189, 118 S.Ct. 1151.

¶ 50 The Court found error, holding that obvious redactions that replace a proper name with a blank space or a word, such as "deleted," were so similar to unredacted confessions that *Bruton's* protections applied. *Id.* at 195, 118 S.Ct. 1151. The Court noted that an obvious deletion referred directly to the existence of the defendant. *Id.* at 192, 118 S.Ct. 1151. The Court acknowledged that, as in *Richardson,* connecting the confession to the defendant required drawing an inference, but distinguished *Richardson* based on the type of inference involved. *Id.* at 195–96, 118 S.Ct. 1151. While the confession in *Richardson* did not refer directly to the defendant and became incriminating only through other evidence, an obviously redacted statement such as the one in *Gray* refers directly to "someone" and prompts the immediate inference, independent of the presentation of any evidence at trial, that the "someone" is the defendant. *Id.* at 196, 118 S.Ct. 1151.

¶ 51 In *Gray,* however, the Court suggested an alternative, acceptable form of redaction, which applies in this case. *Id.* In response to the question, "Who was in the group that beat Stacey?" the redacted confession stated "Me, deleted, deleted, and a few other guys." *Id.* The Court posited that an acceptable alternative would have been to state, "Me and a few other guys." *Id.* That language is similar to the language attributed to Co-defendant Hartley. M.A. asked, "how many guys" there were, to which Hartley answered, "about 30." That statement is the equivalent of saying "me and about twenty-nine other guys." M.A. then asked whether T.S. had "willingly [had] sex with you guys," to which she reported that Hartley said "no," that things "had got[ten] out of hand." These statements comport with the Supreme Court's example in *Gray.*

¶ 52 Unlike the direct reference to the defendant in the confession in *Bruton,* Hartley's references to "30 guys" and "you guys"

did not necessarily incriminate Defendant. 391 U.S. at 137, 88 S.Ct. 1620. Indeed, the link between Hartley's statements and Defendant is even more tenuous than the reference to "[m]e and a few other guys" that the Supreme Court deemed appropriate in *Gray* because the "guys" with whom T.S. did not willingly have sex could have been any of thirty individuals. *See* 523 U.S. at 196, 118 S.Ct. 1151. Hartley's confession itself does not compel the conclusion that Defendant is one of those "30 guys." *See id.* Hartley's statement "contained no direct reference to defendant, was not facially incriminating, ... [and] did not directly refer to defendant's existence." *Herrera,* 174 Ariz. at 395, 850 P.2d at 108; *see also Richardson,* 481 U.S. at 200, 107 S.Ct. 1702. Hartley's statement is linked to Defendant only through other evidence admitted at trial, such as T.S.'s testimony and DNA evidence.

¶ 53 Moreover, the statement attributed to Hartley, that "things got out of hand," does not necessarily incriminate Defendant. It implies that at one point early on, the sex might have been consensual, but then, because of the duration, violence, number of participants, or other factors, it "got out of hand." Defendant was free to argue that things were still in hand when he had sex with T.S. and that T.S.'s sex with him was consensual. Hartley's statement therefore did not incriminate Defendant unless the jury made at least two inferential steps: (1) That Defendant was one of the "thirty guys," and (2) that Defendant's sex acts with T.S. were non-consensual because they occurred after things got out of control. These necessary inferences remove this case from the "narrow exception" created by the ruling in *Bruton.*

¶ 54 The trial court also gave an immediate instruction that Hartley's statements were to be used only against him, and the State did nothing to undermine that instruction. We presume that the jury followed the limiting instruction.[9]

¶ 55 A co-defendant's confession raises serious and significant concerns. Those issues,

9. There is no suggestion that the jury was not able to follow instructions. It did acquit Defen-

dant of the charge that the crimes were intended to further or assist a street gang.

**541**

however, have been weighed by the Supreme Court. Unless the constitution of this State compels a different result—and Defendant has not argued that it does—this court is bound by higher authority.

¶ 56 The dissent in *Richardson* made the point that the dissent here makes: that precluding use of directly incriminating statements while uniformly allowing potentially more damaging indirectly incriminating statements produces an "illogical result [that] demeans the values protected by the Confrontation Clause." *Id.* at 212, 107 S.Ct. 1702 (Stevens, J., dissenting). But on an issue of federal constitutional law, the majority decision of the Court controls. We therefore conclude that the admission of Hartley's statement complied with the *Bruton* line of cases and its Arizona counterpart.[10]

### 3. *The Confrontation Issue*

¶ 57 Defendant alleges that Hartley's statements also present a Sixth Amendment concern—that is, because Hartley did not take the stand, Defendant was denied the opportunity to confront an "accuser." However, because Hartley's statements *alone* do not directly or indirectly implicate Defendant, *see supra* ¶¶ 51–53, Defendant's Sixth Amendment right to cross-examine Hartley has not been implicated or violated. *See Bruton,* 391 U.S. at 126, 88 S.Ct. 1620; *Gray,* 523 U.S. at 196–97, 118 S.Ct. 1151; *Richardson,* 481 U.S. at 206–09, 107 S.Ct. 1702; *Herrera,* 174 Ariz. at 395, 850 P.2d at 108. Because the instruction is deemed to render the confession admissible only against the confessing co-defendant, *see Richardson,* 481 U.S. at 211, 107 S.Ct. 1702, then the statement never was admitted as evidence against the other four defendants, and no confrontation issue is raised. *See Cruz v. New York,* 481 U.S. 186, 190, 107 S.Ct. 1714, 95 L.Ed.2d 162 (1987) ("[A] witness whose testimony is introduced in a joint trial with the limiting instruction that it be used only to assess the guilt of one of the defendants will not be

considered to be a witness 'against' the other defendants."). Accordingly, we find no Sixth Amendment violation.

### C. *Prosecutorial Misconduct*

¶ 58 Defendant challenges the trial court's denial of his request for a mistrial, contending that the prosecutor committed reversible misconduct during his first and rebuttal closing arguments by vouching, by alluding to punishment, by referring to possible unrecorded conversations between T.S. and the detective who investigated another rape allegation, and by impermissibly commenting on Defendant's exercise of his right to remain silent. We will not disturb a trial court's ruling on such a motion unless we find a clear abuse of discretion, *State v. Lee,* 189 Ariz. 608, 616, 944 P.2d 1222, 1230 (1997), and as we review such rulings we bear in mind that "the trial court is in the best position to determine whether an attorney's remarks require a mistrial." *State v. Jones,* 197 Ariz. 290, 305, ¶ 37, 4 P.3d 345, 360 (2000) (quoting *State v. Hansen,* 156 Ariz. 291, 296–97, 751 P.2d 951, 956–57 (1988)). We also bear in mind that the court advised the jury that counsel's statements do not constitute evidence in the case.

¶ 59 Although prohibited from commenting on matters not in evidence before the jury, counsel are otherwise permitted wide latitude in closing argument. *Id.* Prosecutorial misconduct requiring reversal must have so permeated the trial that it probably affected the outcome and denied defendant his due process right to a fair trial. *State v. Bolton,* 182 Ariz. 290, 307, 896 P.2d 830, 847 (1995); *see State v. Hughes,* 193 Ariz. 72, 79, ¶ 26, 969 P.2d 1184, 1191 (1998); *Donnelly v. DeChristoforo,* 416 U.S. 637, 643, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974). Even if misconduct occurs, it "is harmless if we can conclude beyond a reasonable doubt that it did not contribute to or affect the verdict." *State v. Towery,* 186 Ariz. 168, 185, 920 P.2d

---

10. We are aware of this court's opinion in *State v. Williams,* 27 Ariz.App. 279, 287, 554 P.2d 646, 654 (1976), which held a co-defendant's confession in a forcible rape case inadmissible. That case was decided before the Supreme Court decided *Richardson,* 481 U.S. at 200, 107 S.Ct.
1702, and our supreme court decided *Herrera,* 174 Ariz. at 387, 850 P.2d at 100. Because *Williams* was based upon an interpretation of federal constitutional law rather than Arizona constitutional law, we believe that it would not be decided the same way today.

290, 307 (1996) (citing *State v. Bible,* 175 Ariz. 549, 588, 600, 858 P.2d 1152, 1191, 1203 (1993)).

 ¶ 60 In determining whether to grant a mistrial for misconduct, "[t]he trial court should consider (1) whether the prosecutor's statements called jurors' attention to matters the jury was not justified in considering in determining its verdict, and (2) the probability that the jurors were in fact influenced by the remarks." *Lee,* 189 Ariz. at 616, 944 P.2d at 1230 (citation omitted).

### 1. *Vouching*

¶ 61 Defense counsel objected at trial and contends on appeal that the following highlighted portion of the prosecutor's closing argument constituted impermissible vouching.

> I've never tried a more important case in my life. I have never been involved in a more important case in my life. I have never been privileged to have the opportunity to affect the very fabric of our society as I am in this case right now. And the truth is is [sic] that each and every one of you has that same privilege available to you.
>
> . . . .
>
> Ladies and gentlemen, what you do in the next two or three, four days, is going to affect more lives and more people, and affect the very fabric of our society more than anything you will do for the rest of your lives. I can almost assure you of that.
>
> . . . .
>
> I have often been asked, and I have had to respond to the question, don't you just hate that defendant, don't you just hate these people? You know what, I don't hate anyone. I don't hate any one of these five people. I'm appalled by what they did, but I also look at them in terms of what they might have been. You know, I have children, you have children. This age. You look at these young men, and you say to yourselves, things could have been different. And it's very possible things could have been different. They might have grown up to be doctors, they

> might have grown up to be engineers. They might have grown up to work in the postal service or do 20 years in the Air Force or the Army or the Navy.
>
> They might be productive members of our society. But they won't be, they'll never have the chance to be, until they understand one very important lesson, and that is that when you commit a crime, there is a consequence for that crime.
>
> When you harm another person, you must be held responsible for what you've done. And that, again, ladies and gentlemen, goes again to the fabric of our society, doesn't it? Responsibility, personal responsibility, for what you have done. For your actions.
>
> . . . .
>
> And that is what your job is to do. Your job is to say, no, no, no, no longer do we believe that. You are personally responsible for what it is you did, and now it's time to answer to that.
>
> Who knows what the result of that might be? Who knows? Any one of these people may take that to heart. May learn that lesson. May come to the conclusion that, you know what, that jury, that prosecutor, those cops, they were right. Where I was going was the wrong way. And I might be dead, but for them.

 ¶ 62 The Arizona Supreme Court recognizes two forms of prosecutorial vouching: "(1) where the prosecutor places the prestige of the government behind its witness; [and] (2) where the prosecutor suggests that information not presented to the jury supports the witness's testimony." *State v. King,* 180 Ariz. 268, 276–77, 883 P.2d 1024, 1032–33 (1994) (citations omitted). As a corollary of the first form of vouching, the supreme court also has deemed improper attempts by the State to place the prestige of the government behind its case as a whole. *See State v. Leon,* 190 Ariz. 159, 162, 945 P.2d 1290, 1293 (1997).

 ¶ 63 The prosecutor's comments here do not fit neatly into either of these categories. The statements do not attempt to bolster the credibility of any State witnesses or suggest that evidence not before

the jury supports the State's case. Nor do the statements refer to prior transactions or dealings between Defendant and the police. They might, however, be viewed as obliquely placing the prestige of the government behind the case. Nonetheless, we conclude that these unnecessary and irrelevant comments did not deny Defendant a fair trial. *See State v. Dumaine,* 162 Ariz. 392, 401, 783 P.2d 1184, 1193 (1989). The jury was able to assess the importance of the case for itself, and the trial judge, who was in the best position to do so, determined that the statements did not require a new trial. *See id.* at 403, 783 P.2d at 1195. We find no abuse of discretion in that determination.

### 2. *Punishment*

¶ 64 "[C]alling attention to the possible punishment [a defendant faces] is improper because the jurors do not sentence the defendant." *Jones,* 197 Ariz. at 305–06, ¶ 38, 4 P.3d at 360–61. Defendant contends that the portion of the State's closing argument quoted above improperly argued punishment by suggesting that conviction would benefit the defendants because it implies that, if convicted, defendants will be provided with counseling.

¶ 65 We reject Defendant's interpretation of the State's remarks as being clear comments on punishment, in part because we cannot ascribe to them the meaning Defendant suggests. The prosecutor's statements did not suggest that conviction would result in any particular form of punishment. In addition, in preparing the jury for deliberation, the court appropriately instructed the jurors that they were not to consider punishment in reaching their verdict. We presume that the jurors followed the instructions. *See State v. LeBlanc,* 186 Ariz. 437, 439, 924 P.2d 441, 443 (1996). We find no error on this point.

### 3. *Unrecorded Conversations*

¶ 66 Defendant also argues that the prosecutor committed misconduct in his rebuttal argument by referring to possible unrecorded conversations between T.S. and the detective who investigated a subsequent rape allegation.

¶ 67 Evidence was presented that, after the ordeal at issue here, T.S. moved to a new location where she accused another individual of rape. She later recanted that accusation. T.S. testified that she recanted that accusation because the investigating detective, Detective Tate, was mean, yelled at her, displayed handcuffs, and threatened to take her to jail if she did not stop lying. Two taped interviews were played for the jury. In the first, T.S. recounted the circumstances of the alleged rape to Detective Tate; in the second, recorded several hours later, T.S. agreed to "be truthful" about the incident and recanted the allegation, explaining she had fabricated the story because she was afraid of her mother.

¶ 68 In closing argument, defense counsel referred to the tapes and argued that, contrary to T.S.'s testimony, the tapes showed that the detective did not get angry, did not yell, and did not threaten T.S. to coerce the retraction. Anticipating the State's argument that the intimidation occurred when the tape was off, counsel asserted that T.S. had testified that the detective was mean to her the entire time.

¶ 69 In rebuttal, the prosecutor argued that

> the testimony says that a lot of things happened between those two tapes. Most of what is of interest to us happens between those two tapes, was detective Tate yelling and screaming on the tape? No. Might something have happened in the interim? That's for you to determine.

The court overruled a defense objection that the statement shifted the burden to defendants.

¶ 70 On appeal, Defendant argues that this statement constituted vouching because it referred to matters not in the record. Because Defendant based the objection in the trial court on other grounds, he has waived this argument absent fundamental error. *See State v. Hernandez,* 170 Ariz. 301, 307, 823 P.2d 1309, 1315 (App.1991). Fundamental error must go to the foundation of the defendant's case or be of such dimensions that it cannot be said that the defendant

received a fair trial. *See State v. Gendron,* 168 Ariz. 153, 155, 812 P.2d 626, 628 (1991) (citations omitted).

¶ 71 Although counsel may not comment on matters not in evidence before the jury, they may argue reasonable inferences from the evidence presented at trial. *See Jones,* 197 Ariz. at 305, ¶ 37, 4 P.3d at 360; *Dumaine,* 162 Ariz. at 401, 783 P.2d at 1193. The prosecutor's statement clearly referred to T.S.'s testimony about her conversations with Detective Tate. No testimony was presented that all of their conversations were recorded. In fact, T.S. was unaware that any of the conversations had been tape recorded. In addition, the second tape begins with Detective Tate saying to T.S., "I talked to you a while ago about, ah, what really happened between you and Cory and, um, you decided to go ahead and, and be truthful with me about this, is that right?" This statement itself suggests that some conversation occurred off tape between Detective Tate and T.S., during which time T.S. decided to withdraw her accusation. Consequently, a reasonable inference could be drawn that some of the conversations to which T.S. testified were not recorded and took place between the times represented by the two tape-recorded conversations. Therefore, the prosecutor's statement that it was for the jury to decide what happened when the tape was not recording was a logical inference from evidence presented at trial and did not direct the jury to matters that they could not consider. The prosecutor's statement did not constitute misconduct, and we find no error, much less fundamental error, on this point.

4. *Right to Remain Silent*

¶ 72 Defendant argues that the State improperly commented on his failure to testify. In his initial closing argument, the prosecutor made the following argument:

It is replete in the record how many times [T.S.] said I didn't want them to do that. I told them I ain't having sex with y'all. I told you, I didn't want to be in that house with y'all. I told them I don't want to do this. Over and over and over again she said, I don't want to do this. *There is no*

*evidence in this record, no evidence from anyone who was there on the 15th and 16th that she said otherwise. No one.*

[D.E.] took this stand. The friend of the defendants took that stand. Did you ever hear him once say, it looked like she was enjoying it to me? Nope. Says it not one time. I saw her having sex here with this guy, I saw her having sex here with this guy. He never says, I saw her enjoying it. He never said she asked to do it. He never says anything about that at all.

The prosecutor also twice referred to T.S.'s testimony about a sexual encounter with a non-defendant as "uncontradicted."

¶ 73 Defense counsel objected to this argument on the grounds that it commented on Defendant's right to remain silent. The trial court admonished the prosecutor that commenting on the defendants' choice not to testify was "playing with fire," but refused to grant a mistrial. The court stated, "I don't think on this record as a whole that it [d]rew the jury's attention to the defendants' right not to testify. I can bet there'll be an argument if there's a conviction on that." On appeal, Defendant renews his argument that the prosecutor's comment that "there is no evidence [that T.S. consented] from anyone who was there" constituted an impermissible and reversal-requiring comment on his right to not testify.

¶ 74 Comments by a prosecutor about a defendant's failure to testify may violate the defendant's right to be free from compelled self-incrimination. *See Griffin v. California,* 380 U.S. 609, 615, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965); *see also* Ariz. Const. art. 2, § 10. To be impermissible, the comments "must be calculated to direct the jurors' attention to the defendant's exercise of his fifth amendment privilege." *State v. McCutcheon,* 159 Ariz. 44, 45, 764 P.2d 1103, 1104 (1988) (citing *State v. Gillies,* 135 Ariz. 500, 510, 662 P.2d 1007, 1017 (1983)). "[T]he statements must be examined in context to determine whether the jury would naturally and necessarily perceive them to be a comment on the failure of the defendant to testify." *State v. Schrock,* 149 Ariz. 433, 438, 719 P.2d 1049, 1054 (1986) (citing *State v. Chris-*

*tensen,* 129 Ariz. 32, 39, 628 P.2d 580, 587 (1981)). The State may comment that facts in the case are uncontradicted unless the defendant is or appears to be "the only one who could explain or contradict the evidence offered by the state." *State v. Still,* 119 Ariz. 549, 551, 582 P.2d 639, 641 (1978).

¶ 75 We do not believe that the prosecutor's remarks in this case constituted an impermissible comment on Defendant's failure to testify. The prosecutor did not refer directly to any defendant's failure to testify. Indeed, the State's initial comment was followed immediately by a discussion of the testimony of D.E., a non-defendant witness who was present and witnessed sexual acts involving T.S. The subsequent references to uncontradicted testimony involved a sexual act with a non-defendant. Another witness, L.M., testified to her observations on the night of the incident, including seeing T.S. engaging in oral sex with Co-defendant Robinson. T.S. also testified that as many as thirty young men may have been at the scene, and L.M. testified that as many as nine were at the scene when she was there. Given that individuals other than the defendants were shown to be present at the scene, the defendants did not appear to be the only persons who could have explained or contradicted the evidence. *See State v. Fuller,* 143 Ariz. 571, 575, 694 P.2d 1185, 1189 (1985).

¶ 76 Moreover, the trial court, which is in the best position to assess an argument's effect on the jury, concluded that the argument did not direct the jurors' attention to Defendant's failure to testify. *See State v. Atwood,* 171 Ariz. 576, 611, 832 P.2d 593, 628 (1992) (citations omitted). Under these facts, we cannot conclude that the jury would "naturally and necessarily" view the prosecutor's argument as a comment on Defendant's right to remain silent. We find no error.

## CONCLUSION

¶ 77 For the foregoing reasons, we affirm Defendant's convictions and sentences.

CONCURRING: CECIL B. PATTERSON, Jr., Presiding Judge.

FIDEL, Judge, concurring in part; dissenting in part.

¶ 78 The victim's mother unexpectedly testified that Darrion Hartley, a non-testifying co-defendant, had confessed over the telephone that the victim had not willingly engaged in sex:

> I asked Darrion, ... how many guys was there? He said, oh, about 30. And I said, did my daughter willingly have sex with you guys? He said no. That's when I asked him, I said, Darrion, you're supposed to been my daughter's friend, she trusted you. I said why did you let this happen? He said, it got out of control, it got out of hand.

The trial judge promptly told the jury not to consider Hartley's alleged statement as evidence against defendants other than Hartley. But this was not a bell so easily unrung.

¶ 79 The *Bruton* line of cases undertakes to accommodate the confrontation rights of criminal defendants to the practicalities of multi-defendant trials. Trials cannot be precisely scripted. Not every bit of testimony can be foreseen. Trial courts must occasionally tell juries to ignore something they should not have heard. If trial courts could not do so, if they were obliged to mistry and retry every case where untoward evidence slipped by, the system could not absorb the cost.

¶ 80 Thus, the law indulges the "almost invariable assumption" that juries, when instructed to ignore evidence, will follow their instruction. *Richardson,* 481 U.S. at 206, 107 S.Ct. 1702. Yet the law acknowledges that this assumption rests on need and not on truth. In *Richardson,* Justice Scalia somewhat euphemistically explained:

> The rule that juries are presumed to follow their instructions is a pragmatic one, rooted less in the absolute certitude that the presumption is true than in the belief that it represents a reasonable practical accommodation of the interests of the state and the defendant in the criminal justice process.

*Id.* at 211, 107 S.Ct. 1702. In *Bruton,* the Court was more direct:

"The naive assumption that prejudicial effects can be overcome by instructions to the jury ... all practicing lawyers know to be unmitigated fiction."

*Bruton,* 391 U.S. at 129, 88 S.Ct. 1620 (quoting *Krulewitch v. United States,* 336 U.S. 440, 453, 69 S.Ct. 716, 93 L.Ed. 790 (1949) (Jackson, J., concurring)).

¶ 81 In *Bruton,* the Court recognized that cases will arise where justice demands an exception to the ordinary rule:

[T]here are some contexts in which the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored.

391 U.S. at 135, 88 S.Ct. 1620. But the Court has struggled ever since to define the contours of the exception.

## A.

¶ 82 In *Richardson,* the Court undertook to limit the *Bruton* exception to the directly incriminating statements of non-testifying co-defendants—statements incriminating on their face—and to distinguish statements that incriminate only by inference. When the jury must engage in inference to link such a statement to the defendant, the Court observed, "it is a *less valid* generalization that the jury will not likely obey the instruction to disregard the evidence." 481 U.S. at 208, 107 S.Ct. 1702 (emphasis added).[11]

¶ 83 My colleagues find no significant difference between codefendant Williams's inferentially incriminating statement in *Richardson* and the statement attributed to co-defendant Hartley in this case. *Supra* ¶ 46 n. 8. Upon closer examination, however, a substantial difference may be seen.

¶ 84 Defendant Marsh admitted in *Richardson* that she rode to the victims' home with Williams and Martin but denied knowing they were armed and planned to rob and shoot the victims there. As she described events, she entered the home with Martin to ask one of the victims, an acquaintance, for a loan, and, after Martin pulled a gun, she was too scared to flee. Although she acknowledged participating as events unfolded by opening the door for Williams when he rang the doorbell and holding a bag (apparently stolen money) for Martin, she attributed her actions to duress, saying she did not feel free to leave. 481 U.S. at 204, 107 S.Ct. 1702.

¶ 85 Marsh was tried with Williams, and Williams's confession, although redacted to omit any reference to Marsh, permitted the inference that Marsh knew the plan to rob and kill the victims in advance. Specifically, Williams said that he and Martin had discussed the robbery in the car on the way to the house and that, during their discussion, Martin had said that "he would have to take [the victims] out." *Id.* at 203 n. 1, 107 S.Ct. 1702. Marsh testified that she was in the back seat of the car and that Martin and Williams were talking in the front seat, but that the radio was too loud for her to hear what they were saying. *Id.* at 204, 107 S.Ct. 1702. But if the jury disbelieved Marsh's testimony, it could have inferred that Marsh had overheard the front seat conversation and knew en route that robbery and murder were the plan. *Id.*

¶ 86 With this background, we may compare the effects of the co-defendants' statements in *Richardson* and in this case. There, the central question was whether Marsh had foreknowledge of the intended crimes. Here, the central question is whether Defendant had consensual or non-consensual sex with the victim. In *Richardson,* the co-defendant's statement did not address the central question. Williams did not say that Marsh knew of the intended crimes. Nor did he say she heard his conversation with Williams. Nor did he even say whether the volume of their voices and the volume of the radio were such that Marsh could have heard their conversation. Only through a chain of disputed inferences could the jury have concluded from Williams's statement that Marsh had heard and understood enough of the front seat conversation to know that robbery

11. Just as the Court ascribed practicality, not truth, to the assumption that juries can usually follow an instruction to disregard the evidence, *id.* at 211, 107 S.Ct. 1702, the Court declined, even in instances of inferential linkage, to pretend that the common perception is *invalid* that juries can rarely do so. "Less valid" was the most the Court could bring itself to say.

and murder were the plan. Here, by contrast, the statement attributed to co-defendant Hartley directly addresses the focal question of consensual sex, and does so in a manner that transparently incriminates Blackman and the other defendants: "And I said, did my daughter willingly have sex with you guys? He said no."

### B.

¶ 87 The transparently incriminating nature of Hartley's comment makes *Gray* more pertinent than *Richardson* to the analysis of this case. In *Gray*, a majority of the Supreme Court found *Richardson*'s distinction between direct and inferential incrimination an inadequate basis for disposition. Acknowledging that a jury would need an inference to link the defendant to a co-defendant's redacted confession that "Me, deleted, deleted, and a few other guys" beat the victim to death, the Court nonetheless found the statement facially incriminatory. The majority reasoned that the redacted confession so transparently included the defendant among the deleted participants as to "resemble *Bruton*'s unredacted statements [and to] require the same result." *Gray*, 523 U.S. at 192, 118 S.Ct. 1151.

¶ 88 In a passage that my colleagues rely on, the *Gray* majority added that redaction of a co-defendant's confession remained a potentially viable device.[12] Instead of "Me, deleted, deleted, and a few other guys," the Court mused, "Why could the witness not, instead, have said ... Me and a few other guys." *Id.* at 196, 118 S.Ct. 1151. My colleagues find Hartley's inculpatory statement acceptable in the present case because it "comport[s] with the Supreme Court's example in *Gray*." *Supra* ¶ 51.

¶ 89 For several reasons, I disagree. First, the *Gray* example was dictum, and evoked a strong warning from four members of the Court regarding the "risk to the integrity of our system (not to mention the increase in its complexity) posed by the approval of such freelance editing." *Gray*, 523 U.S. at 203–04, 118 S.Ct. 1151 (Scalia, J.,

dissenting). "[I]t is a good deal of a mystery to me[,]" Justice Cardozo once wrote, "how judges, of all persons in the world, should put their faith in dicta. A brief experience on the bench was enough to reveal to me all sorts of cracks and crevices and loopholes in my own opinions when picked up a few months after delivery, and reread with due contrition." Benjamin N. Cardozo, *The Nature of the Judicial Process* 29–30 (1921). Heeding Justice Cardozo's lesson, we should not let the *Gray* majority's dictum determine our disposition here.

¶ 90 But second, if we do compare the *Gray* example with our case, Hartley's statement is not, as my colleagues contend, "more tenuous[ly]" linked with Defendant than "Me and a few other guys" with Gray. *Supra* ¶ 52. The victim in *Gray* was beaten by six youths; the question at trial was whether Gray was one of them. One witness for the prosecution placed Gray among the group chasing the victim, and another placed him among the group kicking the victim. But Gray testified that he was down the street in a phone booth at the time of the beating, and two other defense witnesses corroborated his testimony. *See State v. Gray*, 344 Md. 417, 687 A.2d 660, 661–62 (1997). In short, it was highly disputed in that case whether Gray was one of the "other guys."

¶ 91 In this case, by contrast, it was entirely undisputed that Hartley's four co-defendants were among the "30 guys." Not only did they acknowledge being present; they acknowledged engaging in sexual relations with the victim. The issue was consent. Indeed, consent was the *only* defense, and the whole focus of the trial. Thus, when Hartley, according to the mother, admitted that the victim did not "willingly have sex with you guys," his statement was transparently and powerfully incriminating against all his co-defendants, for it swept their only defense away.

¶ 92 My colleagues, isolating a portion of Hartley's statement from its context, suggest that his explanation, "things got out of hand,"

---

12. In *Richardson*, the Court had reasoned that a practical benefit of limiting the *Bruton* exception to facially incriminating confessions is to permit compliance by redaction. *See Richardson*, 481 U.S. at 208–09, 107 S.Ct. 1702.

**548**

left Defendant free to establish that things did not get out of hand until after Defendant had consensual sex with the victim. *Supra* ¶ 53. But Hartley's comment that things got out of hand was his explanation *why* the victim did not "willingly have sex with you guys," a statement that in context swept in "about 30" guys, including all of the defendants.

¶ 93 My colleagues also ignore, in assuming that Defendant could respond to Hartley's statement, that the trial court admitted the statement only against Hartley and not against the other defendants. Although my colleagues and I dispute the likely efficacy of the trial court's effort to limit the evidence to Hartley, the point remains that no defendant other than Hartley could address his comment without highlighting it and accepting it as evidence applicable to his case.

¶ 94 My colleagues' effort to parse the several parts of Hartley's statement is telling, however, because it underscores the inability of Blackman and the other defendants to do the same by confronting their accuser and subjecting his statement to cross-examination. Hartley did not testify; nor could he be required to do so. His co-defendants could not probe his observations. They could not ask him what or whom he saw, or how clearly he saw "things," before or after they "got out of hand." Hartley's statement destroyed their one defense, yet they were powerless to confront him.

### C.

¶ 95 In summary, although my colleagues seek in *Richardson* and *Gray* a template for the ready disposition of *Bruton* claims, no such template can be fashioned for "[t]he infinite variability of inculpatory statements ... and of their likely effect on juries." *Cruz v. New York*, 481 U.S. 186, 192, 107 S.Ct. 1714, 95 L.Ed.2d 162 (1987) (quoting *Parker v. Randolph*, 442 U.S. 62, 84, 99 S.Ct. 2132, 60 L.Ed.2d 713 (1979) (Stevens, J., dissenting)). In *Richardson*, the Court offered as a template the distinction between direct and inferential incrimination; in *Gray* the Court recognized the inadequacy of that distinction in the face of a statement too transparently and powerfully incriminating

to be ignored. The lesson we should take from these cases is to resist the lure of categorical disposition and to remain alert to statements so transparently and powerfully incriminating that they cannot be squared with a defendant's vital confrontation rights.

¶ 96 In *Coy v. Iowa*, the Supreme Court, through Justice Scalia, stated, "[T]here is something deep in human nature that regards face-to-face confrontation between accused and accuser as 'essential to a fair trial in a criminal prosecution.' " 487 U.S. 1012, 1017, 108 S.Ct. 2798, 101 L.Ed.2d 857 (1988) (quoting *Pointer v. Texas*, 380 U.S. 400, 404, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965)). Defendant Hartley, through his out-of-court statement to the victim's mother, was a devastating witness against his co-defendants. But he could not be confronted, for he did not take the stand. It is a pretense unworthy of the law, in my opinion, that the jury could "perform the overwhelming task of considering [Hartley's statement] in determining the guilt or innocence of [Hartley] and then of ignoring it in determining the guilt or innocence of [his] co-defendants." *Bruton*, 391 U.S. at 131, 88 S.Ct. 1620.

¶ 97 For the foregoing reasons, I respectfully dissent from parts B(2) and (3) of the majority's opinion and, accordingly, from its result. I would reverse and remand for a new trial.