IN THE

# ARIZONA COURT OF APPEALS
DIVISION TWO

---

THE STATE OF ARIZONA,
*Appellee,*

*v.*

CHRISTIAN BETZA VASQUEZ,
*Appellant.*

No. 2 CA-CR 2012-0305
Filed November 8, 2013

---

Appeal from the Superior Court in Pima County
No. CR20110455002
The Honorable Clark W. Munger, Judge

**REVERSED AND REMANDED**

---

COUNSEL

Thomas C. Horne, Arizona Attorney General
by Joseph T. Maziarz, Section Chief Counsel, Phoenix
and Nicholas Klingerman, Assistant Attorney General, Tucson

*Counsel for Appellee*

Altfeld & Battaile P.C.
by Robert A. Kerry

*Counsel for Appellant*

---

**OPINION**

Judge Eckerstrom authored the opinion of the Court, in which Presiding Judge Kelly and Judge Espinosa concurred.

---

E C K E R S T R O M, Judge:

¶1        Following a jury trial, appellant Christian Vasquez was convicted of one count of first-degree murder and twenty-two other felony offenses stemming from a home invasion.  He received a natural life sentence for the murder conviction and a combination of consecutive and concurrent prison terms for the other offenses.  On appeal, Christian claims the trial court erred in denying his motion to sever his trial from that of his codefendant and brother, Orel Vasquez. Christian further maintains the admission of out-of-court statements made by his brother violated the Confrontation Clause of the Sixth Amendment and resulted in reversible error.  We agree that severance was required and consequently reverse the convictions and sentences.[1]

## Factual and Procedural Background

¶2        We view the evidence in the light most favorable to upholding the verdicts.  *See State v. Ruggiero*, 211 Ariz. 262, ¶ 2, 120 P.3d 690, 691 (App. 2005). On August 5, 2009, Christian, Orel, and their cousin Juan planned to burglarize a house they mistakenly believed contained marijuana.  Wearing black clothing and ski masks, Christian, Orel, and two other men entered the house at night, held its four occupants at gunpoint, and stole some personal property and money.  When an unknown car stopped near the house, the men ran outside and tried to force the driver and three passengers to get out.  Orel fired a rifle into the car, killing the fifteen-year-old victim, B.A., and injuring her mother with shattered glass.  The four men ran to their own vehicle, where Juan had been waiting for them, and fled the scene.

---

[1]Our disposition renders it unnecessary to address the sentencing errors that the state has identified in its answering brief.

¶3            Christian, Orel, and Juan then fled to Mexico. There, Juan eventually spoke on the telephone to law enforcement officers in Tucson and confessed his role in the crime. After accepting a plea offer, he testified at trial to the above events. By his account, he was in the car during the entire episode, and as he was driving away, Orel said, "[A] shot went off."

¶4            Christian and Orel's mother, Maria, also testified. She acknowledged reporting to police that she had spoken to her sons about the incident before they had left the country. Maria reported that Christian had told her he had been present at the scene of the home invasion, the victim had been accidentally shot with a rifle, he had not pulled the trigger, and he was going to Mexico because he was scared. Orel had told her that he, too, had been present at the crime scene and was going to Mexico because he was "scared for the same thing." Maria further reported that she had overheard her sons talking about going to the house to get drugs before the crimes were committed. At trial, however, she recanted her earlier report and insisted these statements were all lies she had told in response to threats by the police.

¶5            Juan, Orel, and Christian surrendered to authorities at the Nogales port of entry. Orel subsequently granted an interview to a television news reporter in which he discussed the incident. In the interview, the reporter confronted Orel with police records alleging that "you, your brother and some friends had walked into a home looking for drugs and money." Orel maintained his decision to turn himself in simply reflected that he was one of the three suspects named by police out of six possible participants in the crime. He also said he had agreed to the interview "so we can clear everything out." But over the course of the interview, Orel made various incriminating remarks, stating that what had happened was an "accident," that "[t]hey involved me in it," and that he "had to run" away. He acknowledged that his family members had "wanted us to like turn ourselves in." He further stated, "I'm so sorry . . . but we're not animals," and he maintained it would be "up to [the victim's mother] whether she believes us or not."

¶6            After the state played the video for the jury, Christian renewed his pretrial motions to sever, which the trial court denied. The court provided no instructions limiting the admissibility of his brother's out-of-court statements.

The jury subsequently found Christian guilty of twenty-three felony offenses, and this timely appeal followed the imposition of sentence.

**Discussion**

¶7        On appeal, Christian maintains the trial court erred in denying his motions to sever and in admitting statements that violated his right to confrontation.  In his first motion below, Christian sought to sever his trial from Orel's based on the statements Orel had made in the video that incriminated Christian.  Relying on *Bruton v. United States*, 391 U.S. 123 (1968), and *Crawford v. Washington*, 541 U.S. 36 (2004), Christian argued that "inculpatory statements of a non-testifying co-defendant which incriminate [the other] co-defendant cannot be introduced in a joint trial."  In his second motion to sever, he maintained Orel's incriminating statements to their mother were likewise inadmissible under the Confrontation Clause.  The trial court denied the motions without making express findings.

¶8        We review a trial court's denial of a severance motion for an abuse of discretion.  *State v. Blackman*, 201 Ariz. 527, ¶ 39, 38 P.3d 1192, 1202 (App. 2002).  In so doing, we consider "the evidence before the court at the time the motion was made."  *Id.* We review de novo a defendant's claim that the admission of a codefendant's statements violated the Sixth Amendment right to confrontation. *Blackman*, 201 Ariz. 527, ¶ 41, 38 P.3d at 1203.

¶9        Under Rule 13.4, Ariz. R. Crim. P., a trial court must grant a motion to sever defendants' trials when it "is necessary to promote a fair determination of . . . guilt or innocence."  A trilogy of United States Supreme Court cases—*Bruton*, *Richardson v. Marsh*, 481 U.S. 200 (1987), and *Gray v. Maryland*, 523 U.S. 185 (1998)—establish that a defendant's Sixth Amendment right of confrontation requires trials to be severed if a nontestifying codefendant makes a statement that directly incriminates the moving defendant.  *Blackman*, 201 Ariz. 527, ¶¶ 42, 48, 50, 38 P.3d at 1203, 1204, 1205; *see also State v. Tucker*, 231 Ariz. 125, ¶ 40, 290 P.3d 1248, 1264 (App. 2012) (recognizing "'facially incriminating'" evidence from codefendant as ground for severance under Rule 13.4), *quoting State v. Murray*, 184 Ariz. 9, 25, 906 P.2d 542, 558 (1995).

4

¶10        We may resolve the present appeal based solely on Christian's motion to sever trials pursuant to the Sixth Amendment and the *Bruton* line of cases, due to Orel's recorded news interview.  The state did not dispute at the pretrial hearing that the interview "tends to be facially incriminating" to Christian, and the state conceded it would be inadmissible in a separate trial against him.  Contrary to the state's assertion on appeal, that video is also "testimonial" within the meaning of *Crawford*, and therefore subject to the Confrontation Clause, because it is a "'solemn declaration . . . made for the purpose of establishing or proving some fact.'"  *State v. Boggs*, 218 Ariz. 325, ¶ 56, 185 P.3d 111, 123 (2008), *quoting Crawford*, 541 U.S. at 51.  In the video, Orel states his intention in granting the interview is to "clear everything out."  His words thus acknowledge a testimonial intent and reflect that he "'would reasonably expect [his pretrial statements] to be used prosecutorially.'"  *State v. Parker*, 231 Ariz. 391, ¶ 38, 296 P.3d 54, 65-66 (2013), *quoting Crawford*, 541 U.S. at 51.  And, although no detective was present, Orel made his statements while in custody, pending prosecution for the events that he addressed, and did so in the presence of a video camera that he knew would memorialize anything he said.  This would lead "a reasonable person in the position of the declarant [to] objectively foresee that his statement might be used in the investigation or prosecution of a crime."  *State v. King*, 212 Ariz. 372, ¶ 21, 132 P.3d 311, 316 (App. 2006), *quoting United States v. Summers*, 414 F.3d 1287, 1302 (10th Cir. 2005).  By any measure, the video was testimonial evidence.

¶11        The video also contained hearsay evidence that was inadmissible against Christian.  Hearsay is defined as an out-of-court statement offered to prove the truth of the matter asserted.  Ariz. R. Evid. 801(c); *State v. Bass*, 198 Ariz. 571, ¶ 20, 12 P.3d 796, 802 (2000); *see State v. Roque*, 213 Ariz. 193, ¶ 70, 141 P.3d 368, 389 (2006).  *Crawford* acknowledges that testimonial statements are exempt from the Confrontation Clause when they are used "for purposes other than establishing the truth of the matter asserted."  541 U.S. at 59 n.9.  But Orel's recorded news interview does not fall within this exception.  The video contains at least two items of testimonial hearsay that incriminate Christian, specifically Orel's statements that (1) he was "sorry . . . but we're not animals" and (2) his family members "wanted us to like turn ourselves in."

¶12        Even though Orel generally maintains his innocence in the video, the state sought to introduce it into evidence, in part, for the truth of these

incriminating statements. When a person is "sorry," it usually indicates that he feels "sorrow, regret, or penitence." *Webster's Third New Int'l Dictionary* 2175 (1971). The latter sense specifically indicates a feeling of "sorrow for sins or faults." *Id.* at 1670. Being "sorry" is also nuanced in that it can indicate the speaker either is "feeling or expressing sorrow." *The American Heritage Dictionary* 1672 (5th ed. 2011). The state offered Orel's statement that he was "sorry" not necessarily for its truth about his emotions, but rather for its truth as an expression of penitence and an acknowledgement of fault for the victim's murder, which Orel had characterized as an accident. Similarly, the state introduced the second statement about his family members' wishes to show the truth of the matter asserted—namely, that they wanted Christian, Orel, and Juan to turn themselves in. This statement, in turn, allowed the jury to infer that the brothers' family, including their mother, believed them to be involved in the August 5 offenses and hiding in Mexico. As the state summarized during closing argument:

> [Orel] was there, because he says over and over again, it was an accident, I am sorry, the sort of thing that people would say if they were there, because he was, just like Juan . . . said, and just like other people saw that day, and that's why he left to Mexico, that's why Christian Vasquez left for Mexico, that's why Juan . . . left for Mexico, which is why we don't have masks or guns.

¶13 On appeal, the state analogizes this case to *Richardson*. There, the Supreme Court held the Confrontation Clause does not require severance if a codefendant's statement is not "facially incriminating" to a defendant, but rather becomes incriminating "only when linked with evidence introduced later at trial." 481 U.S. at 207, 208. In such a situation, the constitution permits "the admission of a nontestifying codefendant's confession with a proper limiting instruction." *Id.* at 211. The state maintains Orel's use of "nondescriptive plural pronouns" such as "we" and "us" did not facially incriminate Christian and require severance. The state therefore concludes reversal is not warranted here. This argument fails for at least two reasons.

¶14 First, the pronouns used in the video leave no doubt to whom "we," "us," or "our" refer. The video establishes that the questions refer to "you, your

brother and some friends." The case is thus distinguishable from *Richardson*, which expressly did not apply its holding to situations where "the defendant's name has been replaced with a . . . neutral pronoun." *Id.* at 211 n.5. The present case is instead similar to *Gray*. There, the Court found severance required when a statement had been obviously redacted to include blank spaces in lieu of proper names. 523 U.S. at 189, 197. The problem with such evidence, the Court reasoned, is that it still "function[s] the same way grammatically" as a statement naming a defendant; that is, it incriminates the defendant and essentially points a finger at him. *Id.* at 194. The same problem is created by unique or specific descriptions of an individual. *Id.* at 195. "[Y]our brother" is just such a description that plainly identifies Christian as the topic of Orel's incriminating statements.

¶15        Despite the state's claim that the first-person pronouns in the video possibly could refer "to the other accomplices not on trial," the fact remains that they do not. In the news interview, Orel notes that police had "found three names" and had "said it was you guys," referring to himself, Christian, and Juan. Orel uses the words "we" or "us" when discussing the criminal proceedings or offering some of his apologies. His use of first-person pronouns contrasts with his use of third-person pronouns and descriptions of other, unnamed individuals: "[t]hey [who] involved me in it," "a snitch," "[w]hoever snitched me out, snitched us out," and "the other three [possible suspects] . . . over here in Tucson." In the video, "we" and "us" refer to, at most, the three relatives and named suspects who were sought by the police and who had been hiding in Mexico: Orel, Christian, and Juan. But given Juan's cooperation with the police, and Orel's negative description of him as a "snitch," the two people "we" and "us" refer to consistently and unambiguously are Orel and Christian. Like the defendant in *Gray*, Christian was thus directly implicated by Orel's news interview because his statements "obviously refer directly to someone, often obviously the defendant, and . . . involve inferences that a jury ordinarily could make immediately, even were the confession the very first item introduced at trial." 523 U.S. at 196. The trial court therefore erred in denying the motion to sever.

¶16        The state's argument also suffers a second, independent defect. Even if the state were correct that the video does not require severance pursuant to *Richardson*, reversal still would be required due to the trial court's inadequate

jury instructions.  The state overlooks that *Bruton*, *Richardson*, and *Gray* are all distinguishable in the critical respect that the courts in those cases provided instructions that expressly limited the admissibility of the codefendants' statements.  In *Bruton*, "the trial judge instructed the jury that although Evans' confession was competent evidence against Evans it was inadmissible hearsay against [Bruton] and therefore had to be disregarded in determining [Bruton]'s guilt or innocence."  391 U.S. at 125.  In *Richardson*, "[a]t the time the confession was admitted, the jury was admonished not to use it in any way against [defendant Marsh]," 481 U.S. at 204, and the court repeated the same instruction after closing arguments.  *Id.* at 205.  In *Gray*, "the trial judge specified that the confession was evidence only against Bell; the instructions said that the jury should not use the confession as evidence against Gray."  523 U.S. at 189.  The central question in all these cases was whether such instructions were adequate to protect the defendants' confrontation rights, or whether severance was required notwithstanding the instructions.  *See id.* at 188, 192; *Richardson*, 481 U.S. at 206-07, 211; *Bruton*, 391 U.S. at 126.

¶17        Here, as noted above, the trial court never limited the admissibility of the video.  It merely instructed the jury as follows:

> There are 2 defendants.  You must consider the evidence in the case as a whole.  However, you must consider the charge[s] against each defendant separately.

> Each defendant is entitled to have the jury determine the verdict as to each of the crimes charged based upon that defendant's own conduct and from the evidence which applies to that defendant, as if that defendant were being tried alone.

> The defendant's conduct may include acting as a principal, an accomplice, or a co-conspirator.

Despite the state's claim to the contrary, the above passage demonstrates that the court did not actually prohibit the jury from considering Orel's out-of-court statements from the video when assessing Christian's guilt.  That is, the court

never told the jury that the video could be considered only as "evidence which applies to" Orel's culpability, and could not be considered as evidence against Christian. *Cf. Blackman*, 201 Ariz. 527, ¶ 35, 38 P.3d at 1202 (permitting joint trial where jury instructed statement was "admitted against [declarant] only, and is not to be considered . . . as evidence against any of the other defendants"). While the above instruction could serve to reinforce an earlier, express limitation on the admission of evidence, *see id.* ¶ 38, without such an antecedent, the instruction simply reminds the jury to keep the evidence about each defendant distinct when weighing it. In the court's other instructions here, it informed jurors they were to determine the facts from the evidence produced in court. So it was reasonable and consistent with the court's instructions as a whole for the jury to conclude it could consider Orel's statements to the extent they implicated Christian. Unlike in *Richardson*, 481 U.S. at 206, the presumption that jurors follow instructions in no way prevented a violation of his right to confront adverse witnesses.

¶18        Indeed, the prosecutor's own statements during closing argument suggested the jury could consider the video as evidence against Christian. She argued:

> [W]ith the evidence that you have, and what [that] evidence is, is the testimony that came out of that stand, that is evidence. The pictures that were admitted during this trial, the documents, the plea, and that video, that is what you get to decide this case. And in looking at all that, it is beyond a reasonable doubt that these defendants committed this crime, that they are guilty of these offenses. . . . If you are firmly convinced, from listening to the testimony and looking at these pictures, from seeing what Orel Vasquez had to say on that day, if you are firmly convinced that these defendants committed these crimes, . . . if you are firmly convinced of that, then you have to find them guilty, that's what the law says, and they are.

¶19        In light of these statements from the prosecutor, we reject the state's contention that the error here was harmless. An error is harmless only if a reviewing court can determine beyond a reasonable doubt that it did not affect

the verdict. *State v. Bocharski*, 218 Ariz. 476, ¶ 38, 189 P.3d 403, 413 (2008). Proof beyond a reasonable doubt is "the highest burden that exists in our judicial system." *United States v. Garcia*, 94 F.3d 57, 63 (2d Cir. 1996). And the burden of showing harmlessness rests with the state. *State v. Henderson*, 210 Ariz. 561, ¶ 18, 115 P.3d 601, 607 (2005).

¶20        Subtracting the video here would put this case in a very different evidentiary posture, because it would remove significant and objective corroborating evidence from the state's case. As the prosecutor pointed out in summation, the video was "great" from an evidentiary perspective "because you don't just have a detective up there saying Orel Vasquez told me such and such and such." In the absence of the video, the evidence of guilt was strong, but largely subjective and open to credibility challenges. The evidence was not overwhelming. The case against Christian ultimately depended on testimony rather than physical evidence, and the most probative testimony highlighted by the state—specifically, his mother's recanted statements and Juan's account at trial—was interrelated with, and substantiated by, Orel's incriminating statements in the video. Without the video, therefore, the jury might have credited his mother's recantation or might have doubted Juan's testimony, given that Juan had accepted a favorable plea agreement, had given an account of events that tended to minimize his role in the crime, and had admitted lying to a news reporter about the incident, even after he had already spoken about it to the police. In a separate trial, a reasonable doubt defense would have been much more plausible.

¶21        In all likelihood, the inadmissible video also had an evidentiary impact beyond Orel's statements therein. The state argued below that the video was significant in that it shows Orel "smirking" and "trying to be cute," which generally "shows what type of person he is when he is talking about this horrible crime." Christian characterizes Orel's attitude in the video as indescribably "reprehensible." Christian further maintains "the jury naturally would apply its prejudice to Christian as well as to Orel" because they were brothers and were seated together at the defense table. The state acknowledges on appeal that the video was incriminating largely because of Orel's "elusiveness and demeanor" in it. For all these reasons, we cannot say the denial of severance had no effect on the verdicts.

**¶22** We emphasize that our decision to reverse the convictions and sentences here is based solely on the erroneous admission against Christian of Orel's statements contained within the news interview video at their joint trial. We have elected, for several reasons, not to resolve the evidentiary questions concerning Orel's other out-of-court statements reported by his mother and Juan. First, federal Confrontation Clause jurisprudence concerning testimonial statements is unsettled and subject to rapid development. *See Michigan v. Bryant*, ___ U.S. ___, ___ n.3, 131 S. Ct. 1143, 1155 n.3 (2011) (reserving ruling on testimonial character of statements to private parties); *see also State v. Medina*, 232 Ariz. 391, ¶ 60, 306 P.3d 48, 63 (2013) (observing *Williams v. Illinois*, ___ U.S. ___, 132 S. Ct. 2221 (2012), supplies "no binding rule for determining" what is testimonial); *State v. Shivers*, 230 Ariz. 91, n.5, 280 P.3d 635, 637 n.5 (App. 2012) (describing federal precedents as "choppy waters"). Second, we do not know which specific statements the state might seek to introduce on retrial that would require our analysis. Orel's alleged statement to his mother that he was "scared for the same thing," for example, appears to be a paraphrased version of what she had reported to the police. Third, we do not know the grounds or theories on which the state will seek to introduce such out-of-court statements on remand, nor do we know the grounds on which the defendant will oppose their admission. Ruling on the admissibility of all the statements challenged here is therefore premature.

## Disposition

**¶23** Because the trial court erred in denying Christian's motion to sever trials pursuant to *Bruton* and the Sixth Amendment to the United States Constitution, we reverse his convictions and sentences and remand the case for further proceedings consistent with this opinion.