NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

---

STATE OF ARIZONA, *Appellee,*

*v.*

GUSTAVO TREVINO, JR., *Appellant.*

No. 1 CA-CR 22-0517
FILED 06-11-2024

---

Appeal from the Superior Court in Maricopa County
No.  CR2020-143740-001
The Honorable Jennifer C. Ryan-Touhill, Judge

**AFFIRMED**

---

COUNSEL

Arizona Attorney General's Office, Phoenix
By Gracynthia Claw
*Counsel for Appellee*

The Law Office of Kyle T. Green, Tempe
By Kyle Green
*Counsel for Appellant*

---

## MEMORANDUM DECISION

Presiding Judge Angela K. Paton delivered the decision of the Court, in which Judge Michael S. Catlett and Judge James B. Morse Jr. joined.

---

**P A T O N**, Judge:

¶1    Gustavo Trevino appeals his criminal convictions and sentences for assisting a criminal street gang, participating in a criminal street gang, solicitation of armed robbery, conspiracy to commit armed robbery, solicitation of possession of narcotic drugs for sale, possession of narcotic drugs for sale, and conspiracy to commit first-degree murder. He also requests a new trial. For the following reasons, we affirm.

### FACTS AND PROCEDURAL HISTORY

¶2    We view the facts in the light most favorable to upholding the verdicts. *State v. Burgess*, 245 Ariz. 275, 277, ¶ 3 (App. 2018). In June 2020, Detective Hudson received information about Trevino's involvement in criminal activity and began contacting him in an undercover capacity, pretending to be a cartel member. When they first spoke in October 2020, Detective Hudson asked Trevino if he needed heroin or fentanyl. Trevino told Detective Hudson he did not have any money for drugs at the time but would purchase drugs from Hudson in the future.

¶3    A few days later, Trevino texted Detective Hudson that he would rob people for money and move drugs for Hudson. Trevino assured Detective Hudson he had a good reputation as the leader of Savage Murder Crime Family 451z, also known as the Savage Crime Family ("SCF"), a criminal street gang. Detective Hudson told Trevino they would meet to discuss working for the cartel and then sent Sergeant Sanchez's contact information to Trevino; Sergeant Sanchez also pretended to be a cartel member.

¶4    Trevino contacted Sergeant Sanchez, and Sanchez requested two fentanyl pills. Trevino brought the pills to their meeting, and they discussed work Trevino could do for the cartel. Trevino told Sergeant Sanchez about his involvement with SCF and discussed bringing other gang members to their next meeting. As Sergeant Sanchez drove Trevino home, Trevino told Sanchez he would "lock[] down his neighborhood[,]"

which Sergeant Sanchez believed meant Trevino would rob people selling drugs in his territory because they were taking "our money." Because Trevino said "our money[,]" Sergeant Sanchez believed Trevino believed he was working for the cartel.

¶5            Trevino later called Sergeant Sanchez to discuss killing a person named Thomas,[1] because Trevino believed Thomas was a "snitch[]." Sergeant Sanchez called Trevino to talk him out of killing Thomas. At one point, Trevino texted Sergeant Sanchez, "Hey that fool [Thomas] right here at the park . . . Is there anything you need from me[]?" Sergeant Sanchez interpreted this to mean Trevino was asking him for permission to kill Thomas. Sergeant Sanchez responded via text, stating "nah, leave [him] alone. I'll handle that. . . . Leave that . . . alone."

¶6            In November 2020, Trevino and another gang member, Reyes, met with Sergeant Sanchez and Detective Diaz, another undercover detective, at a warehouse where they again discussed killing Thomas. Sergeant Sanchez told Trevino not to kill Thomas. Trevino told Sergeant Sanchez he also wanted a man named Will killed because Will had assaulted his girlfriend. The next day, Sergeant Sanchez asked Reyes to get Thomas's address and Reyes told Sanchez he would ask Trevino for it. That same day, Trevino texted Sergeant Sanchez a photograph of Will and provided a general location of Thomas's apartment complex.

¶7            Also during the November warehouse meeting, Detective Diaz, Sergeant Sanchez, Reyes, and Trevino discussed specific work Trevino could do for the cartel, such as stealing cocaine from a stash house. Trevino provided details about how to steal the drugs—specifically, he would have two men each monitor the front and side of the house, use guns to resist the armed guards Diaz told Trevino would be protecting the drugs, and tie up the guards if necessary. Trevino understood that Sergeant Sanchez would kill Thomas and Will if Trevino completed the robbery. When Sergeant Sanchez asked Reyes if the armed robbery was something he wanted to do, Reyes responded, "I'm down for whatever."

¶8            Over the next several days, Sergeant Sanchez, Reyes, and Trevino texted about the details of the robbery, such as when it would occur, where it would take place, and when the drugs would be there. Trevino sent Sergeant Sanchez a photo of a map that depicted his plan to commit the robbery and showed another gang member, Carrillo, in the

---

[1] We use pseudonyms to protect the victims' identities. *See* Ariz. R. Crim. P. 31.10(f).

background; Carrillo also participated in the robbery planning. The map contained a signature with Trevino's gang name, SCF, a sketch of the neighborhood, and noted each person's role in the robbery; this map was later found in Trevino's RV. Two days after Trevino texted Sergeant Sanchez the map photo, Trevino and Reyes told Sergeant Sanchez that they could not go through with the robbery because they were unable to obtain guns.

¶9         The State charged Trevino with assisting a criminal street gang, participating in a criminal street gang, solicitation of armed robbery, conspiracy to commit armed robbery, two counts of solicitation of possession of narcotic drugs for sale, possession of narcotic drugs for sale, and two counts of conspiracy to commit first-degree murder. The State also charged Trevino with misconduct involving weapons, but the court severed this charge, and it was later dismissed without prejudice.

¶10         Prior to trial, the parties discussed the extent to which the State could discuss Trevino's time in prison. They stipulated that the State would only discuss that Trevino had been in prison generally and "for starting his own gang" as "he made statements to that effect both on video and in writing." The parties also agreed that the State would not call him a prohibited possessor or elicit testimony regarding his admission to killing someone or any violence that led to him being in prison or that occurred while he was in prison. The parties also stipulated that Detective Knueppel, the State's gang expert, could discuss that Trevino's neck tattoo "is relevant to the work . . . he put in for the gang while in prison[,]" but would not get into the "violence associated with that" work.

¶11         At trial, while describing how he became involved in the case, Sergeant Sanchez testified the police department wanted him to "infiltrat[e] a suspected gang of wanting to seek services for drugs, robberies, and also murder for hire." He said he wanted to know how dangerous the operation would be because he was told "there [were] three or four, maybe even up to five suspects that could potentially have violence potential, long criminal histories and . . . previous prison terms that they served[.]" The superior court stopped the discussion and requested a bench conference. The court noted Sergeant Sanchez "just referenced a lengthy criminal history and prison terms of the people he was investigating." The court stated that before allowing Sanchez to proceed, it wanted "to confirm that this witness knows not to reference anything like that as it pertains to the defendant unless, again, it is part of what [the parties] have already discussed regarding sanitized history." The State confirmed that Sergeant Sanchez had been so advised.

4

¶12 Trevino's counsel responded that although the parties stipulated that Sergeant Sanchez could discuss Trevino's time in prison and Sanchez "did not specifically say it was [Trevino]" who had a lengthy criminal history, he was concerned that the "pure mention of lengthy criminal history" could prejudice Trevino. The State replied that Sergeant Sanchez generally discussed multiple suspects and the jury had already heard Trevino's admission that he was in prison. Trevino then moved for a mistrial, which the court denied.

¶13 Detective Knueppel testified that Trevino had "[g]ang-specific tattoos," including a Mesenos tattoo on his neck, a SCF 451 tattoo on his chin, and a Black Disciples Killer tattoo underneath one of his eyes. Specifically, the detective testified that the "451" tattoo referenced the police radio code for homicide. Trevino again moved for a mistrial, arguing this testimony suggested Trevino was a killer and hinted at Trevino's previous involvement in a 2014 murder. The State responded the tattoo was relevant to Trevino's work for the gang, which the parties stipulated could be discussed. The court noted the testimony did not cross a line because Detective Knueppel only discussed the tattoos on Trevino's face and did not discuss the 2014 incident. The court said the State could ask Detective Knueppel about gang conflicts generally and whether those conflicts motivated Trevino's crimes. But the parties agreed Knueppel could not reference the word "killer." The court denied Trevino's mistrial motion.

¶14 Trevino testified at trial and admitted he had two prior convictions. After a seven-day trial, a jury found Trevino guilty of all counts except one count of solicitation of possession of narcotic drugs for sale and one count of conspiracy to commit first-degree murder of Will. Trevino appeals his convictions. We have jurisdiction under Article 6, Section 9, of the Arizona Constitution and Arizona Revised Statutes ("A.R.S.") Section 13-4033(A)(1).

## DISCUSSION

I.   **Sufficient evidence supports Trevino's convictions for conspiracy to commit armed robbery and conspiracy to commit first-degree murder.**

¶15 We review claims of insufficient evidence de novo. *State v. Watson*, 248 Ariz. 208, 212, ¶ 11 (App. 2020). We will reverse a conviction for insufficient evidence "only if no substantial evidence supports the conviction." *State v. Allen*, 235 Ariz. 72, 75, ¶ 6 (App. 2014) (citation

omitted). Substantial evidence exists if a reasonable person could find the evidence supports "a conclusion of [the] defendant's guilt beyond a reasonable doubt." *Id.* (citation omitted).

¶16  To prove conspiracy, the State had to prove Trevino (1) acted "with the intent to promote or aid" in the underlying offense, (2) agreed "with one or more persons" to commit the crime, and (3) one of the members of the conspiracy committed "an overt act in furtherance of the offense." A.R.S. § 13-1003(A).

## A. Conspiracy to Commit Armed Robbery

¶17  Trevino argues insufficient evidence supports his conviction of conspiracy to commit armed robbery because he withdrew by stopping communications with Sergeant Sanchez and not continuing with the robbery plan. The State responds the evidence was sufficient to prove all elements of conspiracy to commit armed robbery because Trevino (1) intended to aid in the commission of the armed robbery, (2) had an agreement with Reyes and Carrillo, and (3) committed an overt act in furtherance of the armed robbery.

¶18  As applicable here, "[a] person commits robbery if in the course of taking any property of another from his person or immediate presence and against his will, such person threatens or uses force against any person with intent . . . to coerce surrender of property[.]" A.R.S. § 13-1902(A). Armed robbery requires that a defendant be "armed with a deadly weapon or a simulated deadly weapon[,]" or use or threaten to use a deadly weapon, dangerous instrument, or simulated deadly weapon. A.R.S. § 13-1904(A)(1), (2).

¶19  The phrase "with the intent to" means "a person's objective is to cause that result or to engage in that conduct." A.R.S. § 13-105(10)(a). The evidence supports a finding that Trevino acted with the intent to commit armed robbery because he told Sergeant Sanchez he was willing to rob for the cartel, provided a specific plan for the armed robbery during the warehouse meeting, recruited help from other gang members, and created a map of the plan.

¶20  The evidence also supports a finding that Trevino entered into an agreement with Reyes and Carrillo to commit the armed robbery. An agreement exists when two or more persons commit to cooperating in accomplishing a crime. *See* A.R.S. § 13-1003(A); *see also State v. Estrada*, 27 Ariz. App. 38, 39 (1976). Trevino and Reyes attended the warehouse meeting and discussed robbing the stash house with guns. After the

warehouse meeting, they both communicated with Sergeant Sanchez about specific plans to execute the robbery. And Trevino and Carrillo drew a map of the robbery plan.

**¶21** An overt act is any act which "naturally advances the intent of the conspiracy." *State v. Stanley*, 123 Ariz. 95, 104 (App. 1979) (citation omitted). Although Trevino and Reyes were unable to obtain the guns they believed were necessary to carry out the armed robbery, they attempted to do so. Trevino also sent Sergeant Sanchez a map depicting his plan to commit the armed robbery—which included a sketch of the neighborhood and noted each person's role in the robbery. Trevino's "operations plan" advanced his intent to commit the armed robbery. The record evidence therefore supports the finding that Trevino engaged in an overt act.

**¶22** Because the record contains evidence that Trevino acted with intent, entered into an agreement with another person, and committed an overt act in furtherance of the armed robbery, a reasonable jury could find Trevino committed conspiracy to commit armed robbery beyond a reasonable doubt.

### B. Conspiracy to Commit First-Degree Murder

**¶23** Trevino also argues insufficient evidence supports his conviction of conspiracy to commit first-degree murder of Thomas because he successfully withdrew. The State contends that the evidence presented at trial was sufficient because Trevino told Sergeant Sanchez he wanted Thomas dead, asked Sergeant Sanchez for permission to kill Thomas, tried to obtain Thomas's real name and address, and agreed to commit the robbery in exchange for Sergeant Sanchez killing Thomas.

**¶24** To support a conviction for conspiracy to commit first-degree murder, the State must prove the defendant (1) acted with intent to promote or aid in the murder and (2) entered into an agreement with one or more persons to commit the crime of murder. *See* A.R.S. § 13-1003(A); *Evanchyk v. Stewart*, 202 Ariz. 476, 480–81, ¶¶ 16–17 (2002). The State does not need to prove an overt act in furtherance of the conspiracy if its purpose was to commit first-degree murder. *See* A.R.S. § 13-1003(D); *Evanchyk*, 202 Ariz. at 481, ¶ 17. Because the State did not need to prove an overt act occurred, we need not analyze whether sufficient evidence of an overt act exists.

**¶25** As discussed above, the phrase "with the intent to" means "a person's objective is to cause that result or to engage in that conduct." *See supra* ¶ 19; A.R.S. § 13-105(10)(a). Trevino discussed killing Thomas with Sergeant Sanchez on three occasions: (1) after Trevino's first meeting with

Sanchez, he called Sanchez and initiated a discussion about killing Thomas; (2) he texted Sanchez after seeing Thomas at the park and asked him for permission to kill Thomas; and (3) at the warehouse meeting, Sanchez and Trevino discussed why Trevino wanted to kill Thomas. These discussions show that Trevino's objective was to kill Thomas. Thus, the evidence supports a finding that Trevino acted with intent.

¶26　　　The evidence also supports a finding that Trevino entered into an agreement to kill Thomas because he cooperated with Reyes and Sergeant Sanchez to accomplish the crime. During the armed robbery discussion at the warehouse meeting, Reyes told Sergeant Sanchez and Detective Diaz he was "down for whatever" and subsequently told Sanchez he would ask Trevino for Thomas's address, all of which portrays an agreement to kill Thomas. Further, Trevino asked Sergeant Sanchez for permission to kill Thomas when Trevino saw Thomas in the park. And Trevino believed he had to commit the robbery in order for Sergeant Sanchez to kill Thomas. This evidence shows Trevino believed he and Sergeant Sanchez were cooperating. *See* A.R.S. § 13-1003(A); *see also State v. Felkins*, 156 Ariz. 37, 39 (App. 1988) (noting that liability is imposed on the defendant conspiring with an undercover police officer as his intent is the focus of the conspiracy agreement). Thus, the evidence supports the existence of an agreement between Reyes, Sergeant Sanchez, and Trevino to kill Thomas. Because the record contains evidence that Trevino acted with intent and entered into an agreement to kill Thomas, a reasonable jury could find Trevino committed conspiracy to commit first-degree murder beyond a reasonable doubt.

¶27　　　Trevino also argues the evidence supports his successful withdrawal from the conspiracies. Renunciation, or withdrawal, is a defense to conspiracy if the defendant voluntarily and completely renounces his criminal intent, gives law enforcement a timely warning, or makes a "reasonable effort to prevent the conduct." A.R.S § 13-1005(A). Trevino testified that he withdrew from the conspiracy to commit armed robbery when he told Sergeant Sanchez he could not complete the robbery because he could not obtain the guns needed to complete it. He also testified that he withdrew from the conspiracy to kill Thomas by giving Sergeant Sanchez the wrong information about the murders because he did not want Sergeant Sanchez to kill either Thomas or Will.

¶28　　　Although Trevino told Sergeant Sanchez he could not complete the robbery because he could not obtain guns, he did not call the police to inform them of either crime or expressly tell Sanchez not to kill Thomas. And his withdrawal argument presupposes that he entered into

the conspiracy. The jury did not find his withdrawal testimony and evidence persuasive, and we defer to the jury as factfinder, including making credibility determinations. *State v. Fimbres*, 222 Ariz. 293, 300, ¶ 21 (App. 2009). Sufficient evidence supports Trevino's convictions for conspiracy to commit armed robbery and conspiracy to commit first-degree murder.

**II.    The superior court properly limited Sergeant Sanchez's testimony about the suspects' criminal histories and instructed the jurors not to consider Trevino's prior convictions as evidence of his guilt.**

**¶29**         Trevino argues the superior court improperly allowed evidence of his prior bad acts without holding an evidentiary hearing and without the State providing notice of its intent to use the acts. But Trevino did not request a hearing, and he stipulated that the parties could discuss the fact that he had been in prison. The parties stipulated to discussing Trevino's criminal history only for the purpose of showing his gang involvement and that he went to prison and would not discuss any violence associated with Trevino's time in prison.

**¶30**         As a result of this stipulation, the State submitted jury instructions during trial which referenced Trevino's prior convictions. The proposed instruction stated:

> You have heard evidence that defendant has previously been convicted of a criminal offense. You may consider that evidence only as it may affect defendant's believability as a witness. You must not consider a prior conviction as evidence of guilt of the crime for which the defendant is now on trial.

The court included this instruction in the final jury instructions.

**¶31**         In general, relevant evidence is admissible at trial. *See* Ariz. R. Evid. 402. Rule 404(b) bars admission of evidence of "other crimes, wrongs, or acts . . . to prove the character of a person in order to show action in conformity therewith." Ariz. R. Evid. 404(b)(1). Such evidence may be relevant for a non-propensity purpose such as to provide "background" by "allowing the jury to hear the full story of the crime." *State v. Ferrero*, 229 Ariz. 239, 244, ¶ 23 (2012) (quoting *United States v. Green*, 617 F.3d 233, 249 (3d Cir. 2010)). The superior court may exclude relevant evidence, however, "if its probative value is substantially outweighed by . . . unfair prejudice." Ariz. R. Evid. 403. We will affirm the court's ruling absent a clear abuse of discretion. *State v. Connor*, 215 Ariz. 553, 563, ¶ 32 (App. 2007).

**¶32**  Trevino contends the superior court abused its discretion by allowing Sergeant Sanchez to testify about the suspects' criminal histories. We find no abuse of discretion, however, because the court initiated a bench conference and stopped Sanchez's testimony before it potentially became objectionable. *See State v. Champagne*, 247 Ariz. 116, 144–45, ¶¶ 99–100 (2019) (finding no abuse of discretion because the superior court precluded the remainder of the recording when it stepped "up to the line of unfairly prejudicial").

**¶33**  Trevino also argues Sergeant Sanchez's testimony about his criminal history was unfairly prejudicial. Unfair prejudice exists if the evidence tends to cause the jury to make a decision based on "emotion, sympathy or horror." *See State v. Schurz*, 176 Ariz. 46, 52 (1993).

**¶34**  Sergeant Sanchez's testimony about the suspects' criminal histories was relevant to provide context for how he became involved in the case. And the record shows he mentioned criminal histories generally without specifically implicating Trevino when he testified that he needed to assess the dangerousness of the operation.

**¶35**  Sanchez's testimony was not prejudicial because the jury had already heard Detective Hudson testify about a text message he received from Trevino telling Hudson about why he went to prison, Trevino independently testified about his two prior convictions, and the court instructed the jury that it could consider his prior convictions only as they affect his credibility as a witness and not "as evidence of guilt of the crime for which the defendant is now on trial." *See State v. Crain*, 250 Ariz. 387, 394, ¶¶ 22–23 (App. 2021) (rejecting claims that defendant was prejudiced by criminal history evidence when the defendant subsequently testified, prior convictions were admitted to impeach him, and the jury was instructed to only consider his prior convictions for credibility purposes and not for guilt of the crime for which he was accused). We presume the jury follows instructions. *State v. Canion*, 199 Ariz. 227, 237, ¶ 43 (App. 2000). And, importantly, the jury acquitted him of other charges, which further supports the conclusion that it did not improperly consider his prior convictions as automatic evidence of guilt or render its decision on the basis of "emotion, sympathy or horror." *See State v. Herrera*, 232 Ariz. 536, 548, ¶ 32 (App. 2013) (citations omitted).

**¶36**  Thus, because Sergeant Sanchez's testimony did not suggest Trevino had the propensity to commit the crimes in question, we conclude Sanchez's testimony was not prejudicial.

### III. The superior court did not err in denying Trevino's mistrial motions.

¶37        Trevino argues the superior court erred by denying his two motions for mistrial based on (1) Sergeant Sanchez's testimony, as discussed in Section II of this decision, and (2) Detective Knueppel's testimony about his tattoos. We review the superior court's denial of a motion for mistrial for an abuse of discretion. *State v. Blackman*, 201 Ariz. 527, 538, ¶ 41 (App. 2002).

¶38        "A mistrial is a 'most dramatic' remedy that 'should be granted only when it appears that [it] is the only remedy to ensure justice is done.'" *Id.* (citation omitted). The superior court must consider two factors when determining whether to grant a mistrial based on witness testimony: (1) "whether the testimony called to the jurors' attention" evidence they could not consider "in reaching their verdict" and (2) "the probability under the circumstances of the case that the testimony influenced the jurors." *State v. Lamar*, 205 Ariz. 431, 439, ¶ 40 (2003) (citation omitted). To determine whether the testimony influenced the jury, we consider whether other similar evidence was admitted during the trial. *See State v. Dann*, 220 Ariz. 351, 363, ¶¶ 49–50 (2009). "The decision to grant a mistrial is left to the sound discretion of the [superior] court and in the absence of a showing of abuse of that discretion, the [superior] court's decision will not be disturbed on appeal." *State v. Hallman*, 137 Ariz. 31, 37 (1983) (citation omitted).

¶39        The superior court "should consider . . . the probability that the jurors, under the circumstances of the particular case, were influenced by the remarks." *See State v. Bailey*, 160 Ariz. 277, 279 (1989). Trevino first moved for a mistrial in response to Sergeant Sanchez's statement about the suspected gang members' criminal histories, arguing the testimony prejudiced the jury because it could infer Trevino had multiple criminal convictions. Even if Sergeant Sanchez's testimony led to that inference, Trevino's own testimony about prior convictions created the same inference, Sergeant Sanchez did not mention Trevino by name, and the court instructed the jury not to consider his prior convictions as evidence of guilt. Thus, the court did not abuse its discretion in determining there was little probability that the jury would be influenced by the remark and denying Trevino's motion for a mistrial. *See State v. Laird*, 186 Ariz. 203, 207 (1996) (stating that the brevity of inadmissible testimony was relevant to upholding denial of mistrial); *State v. Almaguer*, 232 Ariz. 190, 199, ¶ 29 (App. 2013) (finding no reasonable probability that the jury was influenced by isolated testimony that was not mentioned again).

**¶40** The court also did not abuse its discretion in denying Trevino's mistrial motion after Detective Knueppel testified about Trevino's tattoos. The superior court does not abuse its discretion by denying a mistrial if the admission of potentially prejudicial evidence was unlikely to influence a jury's verdict given other similar, relevant evidence admitted at trial. *See Dann*, 220 Ariz. at 363, ¶¶ 49–50. Here, Detective Knueppel testified about Trevino's gang-specific tattoos, but most notably his Black Disciples Killer tattoo. Trevino objected to Knueppel's testimony and moved for a mistrial, arguing it suggested Trevino "is a killer" and referenced Trevino's involvement in a 2014 murder. The State argued the tattoo was relevant to explain Trevino's promotion of his own gang. In response to Trevino's argument that the testimony suggested "he wanted to kill that gang[,]" the court said that in its opinion, Trevino was "making a leap." And in reference to Detective Knueppel's testimony about Trevino's 451 tattoo, which is a police radio code for homicide, the court asked whether "the jury [is] going to assume . . . [Trevino is] out there doing all these homicides" from that testimony.

**¶41** Other evidence presented at trial, such as Trevino's desire to kill Thomas and Will and his involvement with the SCF gang, is evidence from which a reasonable jury could infer Trevino was potentially involved in violence and gang activity. Accordingly, we see no reasonable probability that the jury's verdict was impacted by the remarks. *See Almaguer*, 232 Ariz. at 199, ¶ 29. Thus, the superior court did not abuse its discretion by denying Trevino's motion for a mistrial.

## CONCLUSION

**¶42** We affirm.



AMY M. WOOD • Clerk of the Court
FILED: AGFV